## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | |
|---|---|
| HEALTH CARE SERVICE CORPORATION, A MUTUAL LEGAL RESERVE COMPANY, | Case No. |
| *Plaintiff*, | |
| vs. | **ORIGINAL COMPLAINT** |
| NEUROMONITORING ASSOCIATES, LLC, PHYSICIAN OVERSIGHT, LLC, and MONITORING ASSOCIATES LLC, | **DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiff Health Care Service Corporation, a mutual legal reserve company ("HCSC"), brings this Complaint against Defendants Neuromonitoring Associates, LLC ("NMA"), Physician Oversight, LLC ("Physician Oversight"), Monitoring Associates LLC ("Monitoring Associates") and alleges as follows:

## INTRODUCTION

1.      Defendants perpetrated two independent fraud schemes, stacked on one another, that have damaged HCSC to the tune of tens of millions of dollars.

2.      The first scheme centers on Defendants' illegal kickbacks to surgeons in exchange for them ordering intraoperative neuromonitoring ("IOM") services from Defendants during the surgeons' procedures. Defendants then improperly obtain reimbursement from health plans based on services and claims for benefits that are tainted by the kickbacks.

3.      The second scheme amplifies the harm by inflating reimbursement on the underlying claims. Specifically, Defendants systematically exploit the federal No Surprises Act's ("NSA") independent dispute resolution ("IDR") process ("IDR Process") by knowingly

submitting misrepresentations and false attestations of eligibility for services that they know are ineligible for the IDR Process. Consequently, Defendants receive massively inflated sums for IOM services—in the form of improper IDR awards—that, independent of the usual evils associated with services and claims tainted by kickbacks, far exceed any reasonable market value for such services.

4.      NMA was founded in or around 2007 by Nick Luekenga in Las Vegas, Nevada with the goal "to offer full [IOM] Services to all facilities in any location."[1] NMA operates through a web of affiliates, including Physician Oversight and Monitoring Associates, also owned and controlled by Luekenga.

5.      IOM services are largely a commodity, making the IOM market fragmented and highly competitive among IOM providers.

6.      To increase its market share and gain an edge over competitors, Defendants implemented a scheme whereby Defendants pay kickbacks to surgeons by giving the surgeons a portion of collections received for the IOM services that the surgeons refer to Defendants.

7.      Healthcare claims for services tainted by kickbacks violate state and federal law and HCSC's policies, and, thus, are not payable. However, NMA and its web of affiliated entities and surgeons concealed Defendants' illicit financial arrangement with surgeons from HCSC and others. As a result, HCSC unwittingly paid reimbursements to Defendants on claims tainted by kickbacks.

8.      Defendants saw an opportunity to make even more money with the enactment of the NSA which, among other things, established the IDR Process, intended to efficiently resolve

---

[1] NMA (Neuromonitoring Associates), *Overview*, Available at: https://www.linkedin.com/company/neuromonitoring-associates/.

out-of-network disputes and decrease aggregate healthcare costs. Notably, the NSA also includes strict eligibility requirements about which services and items are subject to the IDR Process.

9.      Defendants soon concluded that the NSA was "a great boon to NMA" and "very fruitful."[2] Accordingly, Defendants began systematically manipulating the system's safeguards by submitting false attestations and misrepresentations to HCSC, entities overseeing the IDR Process ("IDR Entities," referred to as "IDREs"), and federal agencies to make services and items appear eligible for the IDR Process when, in fact, they are not.

10.     As a result of this illegal conduct, Defendants have wrongly obtained thousands of awards against HCSC in the IDR Process for ineligible services and items. Similarly, Defendants' improper submissions have caused HCSC to incur millions in administrative fees and additional administrative and staffing expenses, which continue to accrue due to Defendants' continued improper submissions.

11.     Defendants' fraudulent submissions of items and services to the IDR Process is no mistake or accident—HCSC estimates that a majority of all IDR Processes initiated by NMA and its affiliates are for ineligible services or items.

12.     Through this action, HSCS now seeks: (i) damages for payments made on claims tainted by illegal kickbacks and/or on IDR awards for ineligible services or items; (ii) vacatur of the fraudulently obtained IDR awards for ineligible services under 9 U.S.C. § 10(a); (iii) an injunction preventing Defendants from continuing their fraudulent schemes; and (iv) any other relief that the Court deems just and proper.

---

[2] Plaintiff's Verified Complaint at ¶ 38, *NMA Holdings, LLC v. Shinn, et al.*, Cause No. 2024-0028 (Del. Ch. Jan. 11, 2024).

## THE PARTIES

13.    Plaintiff Health Care Service Corporation, a mutual legal reserve company, is incorporated in Illinois and has its principal place of business in Illinois. HCSC provides different types of health insurance policies and health benefit administration services for group customers, including employers and governmental entities in five states: Illinois, Montana, New Mexico, Oklahoma, and Texas. In Texas, HCSC's division Blue Cross Blue Shield of Texas ("BCBSTX") serves over 8 million members across all 254 counties.

14.    Defendant Neuromonitoring Associates, LLC is a Nevada limited liability company with a principal place of business in Las Vegas, Nevada. The sole member of Neuromonitoring Associates, LLC is NMA Holdings, LLC, a limited liability company incorporated in the state of Utah with a principal place of business in Las Vegas, Nevada. The sole member of NMA Holdings, LLC is Nick Luekenga, who is a citizen of the State of Nevada.

15.    Defendant Physician Oversight, LLC is a Texas limited liability company with a principal place of business in Las Vegas, Nevada. The sole member of Physician Oversight, LLC is also NMA Holdings, LLC. Upon information and belief, Physician Oversight, LLC is one of the corporate entities that NMA uses to submit claims for reimbursement to payors.

16.    Defendant Monitoring Associates, LLC is a Nevada limited liability company with a principal place of business in Las Vegas, Nevada. The sole member of Physician Oversight, LLC is also NMA Holdings, LLC. Upon information and belief, Monitoring Associates, LLC is one of the corporate entities that NMA uses to submit claims for reimbursement to payors

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1332 because there is complete diversity amongst the plaintiff and defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.    Plaintiff is a mutual legal reserve company incorporated in Illinois and with its principal place of business in Illinois.

19.    As laid out above, Defendants are citizens of the State of Nevada.

20.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law. Specifically, Plaintiff asserts claims under The Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1961, *et seq.*; *see also* 18 U.S.C. § 1964(a) ("The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter."). The Court has subject-matter jurisdiction over Plaintiff's other claims under 28 U.S.C. § 1367, as those claims are so related to Plaintiff's federal statutory causes of action that they form part of the same case or controversy.

21.    This Court has specific jurisdiction over Defendants because they systematically and continuously conduct business in Texas, including committing the acts that give rise to this lawsuit. Specifically, as part of this scheme, Defendants purposefully directed its services towards Texas providers and established continuing business obligations there. Indeed, the vast majority of ineligible claims submitted by Defendants that gave rise to this lawsuit were based on services rendered to Texas residents in Texas. Moreover, upon information and belief, Defendants knew that their scheme would most impact health benefit plans and plan sponsors within Texas,

including BCBSTX. Finally, NMA states that its headquarters is 550 N. Central Expy, Unit 2586 McKinney, TX 75070.[3]

22.     Venue is proper in this District under 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim[s]" in this action occurred in this District. 28 U.S.C. § 1391(b)(2). Specifically, Defendants targeted its actions towards HCSC and BCBSTX, which has its main Texas campus in Richardson, Collin County, which is in this District. In addition, medical services were reportedly rendered to HCSC's members in this District (among other places), and Defendants improperly initiated hundreds of IDR Processes on behalf of providers within this District. NMA also states that its headquarters is in McKinney, TX.

## THE PROHIBITION ON KICKBACKS[4]

23.     Multiple Texas laws—ranging from the Occupations Code to the Penal Code—prohibit the payment of kickbacks, which refers to the exchange of money, gifts, or services (remuneration) to induce a provider to refer services or patients, order tests, prescribe products, or take other actions.

24.     Texas's prohibition on kickbacks within the Occupations Code is broad and applies to the commercial claims at issue in this case. Texas Occupations Code § 102.001 prohibits a person from "offer[ing] to pay or agree[ing] to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency."

---

[3] NMA, *Contact Us*, Available at: https://nmaiom.com/contact/contact-neuromonitoring-associates.html.
[4] The laws and policies described in this section are collectively referred to herein as the "Kickback Laws and Policies."

25.     Texas also outlaws commercial bribery. Texas Penal Code § 32.43 makes it a crime for a fiduciary (a physician), to accept, solicit, or agree to accept "any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary" (the patient), without the consent of his beneficiary. The law also makes it a crime to "offer[], confer[], or agree[] to confer" such a bribe.

26.     In addition, Texas law prohibits a provider or physician from billing for services that it knows are improper, unreasonable, or medically unnecessary. Texas Occupations Code § 101.203 provides that "[a] health care professional may not violate Section 311.0025 (Audits of Billing), Health and Safety Code." Section 311.0025, in turn, states the following: "A hospital, treatment facility, mental health facility, or health care professional may not submit to a patient or a third party payor a bill for a treatment that the hospital, facility, or professional knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary."

27.     As described in more detail below, Defendants have engaged in conduct that violates these Texas laws.

28.     Regardless of whether a provider is in-network or out-of-network, HCSC has a policy of not paying claims for services that violate state or federal law or amount to fraudulent billing.

## HCSC RELIES UPON PROVIDERS TO SUBMIT TRUTHFUL AND ACCURATE INFORMATION AND TO CERTIFY COMPLIANCE WITH APPLICABLE LAWS

29.     To obtain payment for services rendered to HCSC members, healthcare providers submit standard healthcare "claims forms" representing the services provided and being billed.

30.     In submitting these claims forms, providers utilize industry standard codes that reflect the nature of the service being billed. Providers also must accurately include other information on the claim forms regarding the treatment, such as the place where the service

occurred, the type of service performed, and the diagnosis. In submitting claims, providers further represent that the treatment provided was medically necessary and appropriate and certify that they followed all applicable laws and regulations, have not violated applicable laws, and that their claim forms are accurate.

31.    HCSC relies on providers to submit truthful and accurate information on their claim forms so that HCSC can accurately determine if the claim is payable, whether the treatment is covered by a member's plan, and the amount of payment owed.

32.    In turn, providers intend for HCSC to rely on representations made on a claim form to determine payment.

## INTRAOPERATIVE NEUROMONITORING

33.    IOM describes a variety of procedures its proponents say can be used to monitor the integrity of neural pathways during certain neurosurgical, orthopedic, and vascular surgeries.

34.    A surgeon can order IOM services. But they are not always considered medically necessary, depending on the type of procedure, among other things.

35.    The facility where the procedure is performed typically provides a technician ("IOM Technician") in the operating room to monitor and track data. The facility typically pays the technician. In claims coding and billing parlance, this is the "Technical Component" of IOM services.

36.    A physician located offsite—typically, a neurologist—is then responsible for reviewing the patient's baseline with the surgeon prior to the operation, monitoring the operation in real-time through audio and video connections, interpreting the collected data, and communicating any events with the surgeon. Again, in claims coding and billing parlance, this part of the service is referred to as the "Professional Component."

37.     As pertains here, Defendants' claims reported services and sought reimbursement for the offsite neurologist's services, i.e., the Professional Component.

38.     The IOM industry is highly competitive, with many service providers jockeying for market position and shares amongst each other.

## THE FOUNDING AND EARLY YEARS OF NMA

39.     NMA supplies IOM technicians and interpreting physicians for surgical procedures. Since IOM services must be ordered by a surgeon, NMA views marketing to and forming relationships with surgeons as the way for it to grow.

40.     For many years after its founding in 2007, NMA was relatively modest in size and limited to the Las Vegas, Nevada area. However, NMA recently significantly expanded its market share and geographic coverage.

## COMMON PRACTICE OF KICKBACKS IN THE IOM INDUSTRY

41.     To incentivize surgeons to order IOM services, some IOM providers began paying illegal remuneration to surgeons through joint venture companies.[5]

42.     These types of schemes generally worked as follows. A surgeon would set up an LLC with a generic, IOM-related name, in conjunction with an IOM provider. Those LLCs would enter into Management Services Agreements with a company related to the IOM provider to, among other things, lease providers for the provisions of IOM services and bill and collect for the provision of the IOM services.

43.     The surgeon would then order IOM services from the LLC, but in reality the services would be rendered by the IOM provider. Through the Management Services Agreement,

---

[5] *See, e.g.*, United States Attorney's Office District of Colorado, *$2 Million Resolves Kickback Allegations Relating to Denver Neuromonitoring Company*, (Dec. 3, 2024), Available at: https://www.justice.gov/usao-co/pr/2-million-resolves-kickback-allegations-relating-denver-neuromonitoring-company.

the IOM provider would then bill payors for the IOM services on behalf of the LLC. A portion of the reimbursements received for the IOM services would then be routed to the ordering surgeon, with the IOM provider keeping the balance under the guise of a "management fee."

44.    On August 18, 2023, the Office of the Inspector General ("OIG") issued OIG Advisory Opinion No. 23-05 finding that the above-referenced arrangement "would generate prohibited remuneration under the Federal anti-kickback statute[.]"[6]

45.    Specifically, OIG examined a proposed arrangement involving the formation and operation of a turnkey IOM practice owned by the ordering surgeons, where the surgeon owners would order IOM services from the IOM practices in which they had ownership interests. A third party would "lease" its neurologists and neurophysiologists to the newly created IOM practice and provide billing, collection, and other administrative services in exchange for a fee. The surgeon owners would receive distributions of the IOM practice's profits.[7]

46.    OIG found this arrangement "would present a host of risks of fraud and abuse under the Federal anti-kickback statute" because, among other things, it "could be used as a vehicle to induce referrals" by the surgeon owners.[8]

**NMA EXPANDS INTO TEXAS USING AN ILLEGAL KICKBACK SCHEME**

47.    Following regulatory scrutiny, NMA realized an opportunity: NMA could convince surgeons that their arrangements with NMA's competitors were illegal and entice surgeons to instead work with NMA, which would purchase the LLC previously owned by the surgeons.

---

[6] Department of Health and Human Services, Office of Inspector General, *OIG Advisory Opinion No. 23-05*, (Aug. 18, 2023), Available at: https://oig.hhs.gov/documents/advisory-opinions/1128/AO-23-05.pdf.
[7] *Id*.
[8] *Id*.

48. Upon information and belief, NMA specifically informed surgeons that their arrangement with NMA's competitors was illegal because the surgeons owned the LLCs ostensibly providing IOM services and billing for the same.

49. Accordingly, upon information and belief, NMA offered to buy the surgeons' LLCs—so the surgeons no longer had an ownership stake on paper—but **continue to provide the same services and kickbacks to surgeons** for IOM services those surgeons ordered.

50. Despite the surgeons no longer having an ownership interest in the LLCs, on information and belief, NMA continued the same practice of providing surgeons with a portion of collections received from IOM services that the surgeon referred to NMA and its affiliates. In turn, the surgeons nearly exclusively ordered IOM services from Defendants for the surgeons' procedures so that the surgeons could pocket illicit kickback funds.

51. Indeed, upon information and belief, NMA, through its related and commonly owned affiliates—including Alliance Medical Analytics, LLC, Monitoring Associates, Peak Neuro Monitoring, LLC, Physician Oversight, Synaptixs IONM LLC, TCM Healthcare LLC, and University Neuro LLC—provides surgeons with IOM services, with a portion of their collections being distributed back to the surgeons.

52. Notably, prior to NMA's purchase of the surgeons' LLCs and agreeing to pay the surgeons kickbacks, the surgeons rarely ordered IOM services from Defendants. But, after NMA bought the surgeons' LLCs and entered into the above-described arrangement, the surgeons consistently and almost exclusively began ordering IOM services from NMA and its affiliates.

53. At least one IOM company has sued NMA because "NMA illegally converted [its] customers by bribing and kicking back surgeons in exchange for their intra-operative monitoring

business (after making fraudulent statements or omissions to the surgeons and hospitals about the legality of these payments) . . . ."[9]

54.    The amended complaint in that lawsuit includes a draft Management Agreement for surgeons to enter into with Monitoring Associates whereby Defendants effectively provide the surgeon with IOM services and does billing on an "exclusive" basis, with Defendants retaining a percentage of collections as a so-called "management fee."[10]

55.    The amended complaint also includes the following excerpted spreadsheet by which "NMA thoroughly tracks each physician partner's profitability, including, but not limited to: (i) the total revenue generated by the physician partner [for IOM services]; (ii) the number of cases performed by each physician partner; (iii) the so-called 'partnership expense' paid to each physician partner; (iv) the reader expenses associated with the physician partner's cases; and (v) the total profit associated with each physician partner":

---

[9] Am. Compl. ¶ 1, Dkt. No. 31, *Nuvasive Clinical Servs., Inc.* v. *Neuromonitoring Assocs., LLC*, Case No. 1:18-cv-04304 (N.D. Ill. Nov. 1, 2018).
[10] *Id.* at Exhibit D.



| Surgeon | # of Cases Performed | Total Revenue | Partnership Expense | Reader Expense Per Case | Reader Expense | Labor Expense (Mgrs/Directors) at 350/hr) | Total Expense | Profit (based on Tot 2016 Rev) |
|---|---|---|---|---|---|---|---|---|
| | 187 | $351,326.54 | $- | 100.00 | $18,700.00 | $100,665.66 | $119,465.66 | $231,860.888 |
| | 244 | $312,849.12 | $53,904.19 | 100.00 | $24,400.00 | $77,624.37 | $156,028.56 | $210,824.75 |
| | 217 | $297,718.83 | $30,537.88 | 100.00 | $21,700.00 | $102,303.66 | $154,641.54 | $173,715.17 |
| | 238 | $247,114.29 | $7,448.05 | 100.00 | $23,800.00 | $50,497.56 | $81,845.61 | $172,816.73 |
| | 188 | $256,388.51 | $29,246.23 | 100.00 | $18,800.00 | $73,192.63 | $121,338.86 | $164,339.88 |
| | 156 | $202,630.23 | $19,998.37 | 100.00 | $15,600.00 | $25,478.98 | $61,177.35 | $161,551.25 |
| | 198 | $226,291.52 | $22,455.84 | 100.00 | $19,800.00 | $48,568.02 | $90,923.86 | $158,123.50 |
| | 82 | $193,773.59 | $13,756.39 | 100.00 | $8,200.00 | $37,114.41 | $59,170.80 | $148,459.18 |
| | 270 | $236,890.82 | $31,711.83 | 100.00 | $27,000.00 | $74,298.68 | $133,110.51 | $135,592.14 |
| | 149 | $200,362.23 | $12,232.56 | 100.00 | $14,900.00 | $75,280.25 | $102,512.81 | $110,181.98 |
| | 95 | $155,118.26 | $7,717.33 | 100.00 | $9,500.00 | $35,984.18 | $53,301.51 | $109,634.08 |
| | 154 | $171,768.49 | $26,660.51 | 100.00 | $15,400.00 | $49,016.79 | $91,177.30 | $107,351.70 |
| | 88 | $153,186.06 | $- | 100.00 | $8,800.00 | $37,430.64 | $46,330.64 | $106,955.42 |
| | 66 | $195,707.42 | $- | 100.00 | $6,600.00 | $83,881.66 | $90,581.66 | $103,225.76 |
| | 104 | $140,191.74 | $11,447.36 | 100.00 | $10,400.00 | $32,321.84 | $54,269.20 | $97,469.90 |
| | 153 | $181,578.92 | $19,020.64 | 100.00 | $15,300.00 | $69,152.83 | $103,573.47 | $97,126.09 |
| | 83 | $174,690.14 | $31,317.87 | 100.00 | $8,300.00 | $77,566.95 | $117,784.82 | $88,823.19 |
| | 107 | $153,348.08 | $10,999.55 | 100.00 | $10,700.00 | $62,916.64 | $84,716.19 | $81,731.44 |
| | 222 | $183,511.22 | $- | 100.00 | $22,200.00 | $84,293.21 | $106,593.21 | $77,058.01 |
| | 76 | $148,521.22 | $16,546.46 | 100.00 | $7,600.00 | $69,523.32 | $93,769.78 | $71,397.90 |
| | 48 | $93,994.87 | $- | 100.00 | $4,800.00 | $18,805.72 | $23,705.72 | $70,389.15 |
| | 91 | $115,082.69 | $13,568.85 | 100.00 | $9,100.00 | $36,670.53 | $59,439.38 | $69,312.16 |
| | 136 | $123,954.61 | $9,936.87 | 100.00 | $13,600.00 | $41,635.67 | $65,272.54 | $68,718.94 |
| | 92 | $93,362.40 | $- | 100.00 | $9,200.00 | $25,027.65 | $34,327.65 | $59,134.75 |
| | 46 | $86,667.03 | $- | 100.00 | $4,600.00 | $15,297.24 | $19,997.24 | $66,769.79 |
| | 112 | $157,153.63 | $6,843.33 | 100.00 | $11,200.00 | $88,225.22 | $106,368.55 | $57,728.41 |
| | 36 | $80,168.22 | $5,903.94 | 100.00 | $3,600.00 | $25,175.59 | $34,779.53 | $51,392.63 |
| | 39 | $67,405.87 | $15,997.83 | 100.00 | $3,900.00 | $13,359.91 | $33,357.73 | $50,145.96 |
| | 119 | $113,466.70 | $6,247.15 | 100.00 | $11,900.00 | $53,367.34 | $71,614.49 | $48,199.36 |
| | 84 | $95,063.78 | $7,368.44 | 100.00 | $8,400.00 | $40,688.88 | $56,557.32 | $45,974.90 |
| | 22 | $56,485.33 | $- | 100.00 | $2,200.00 | $8,334.84 | $10,634.84 | $45,950.49 |
| | 11 | $49,715.06 | $- | 100.00 | $1,100.00 | $4,991.88 | $6,191.88 | $43,623.18 |

56.    These illegal kickbacks have allowed NMA to obtain a sizable market share throughout Texas. In fact, NMA's principal place of business has since moved from Las Vegas to McKinney, Texas.

57.    The following are representative examples of Defendants' kickback scheme in action.

### *Dr. Vudhi Slabisak*

58.    Dr. Vudhi Slabisak is an orthopedic surgeon who practices in or around the Plano, Texas area.

59.    Upon information and belief, Dr. Slabisak previously had a relationship with one of NMA's IOM competitors, MPowerHealth, whereby Dr. Slabisak received remunerations for IOM services ordered from MPowerHealth.

60.    The relationship worked as follows. In March of 2016, Dr. Slabisak created an LLC under Texas law—Neurovital, PLLC ("Neurovital")—for which he was the President, Managing Member, and owner.

61.    Shortly thereafter, Neurovital, PLLC entered into a Management Services Agreement with an affiliate of MPowerHealth.

62.    Upon information and belief, Dr. Slabisak would then order IOM services for his procedures from Neurovital; MPowerHealth would actually provide the IOM services and bill payors for them; MPowerHealth would take some of the collections under the guise of a "management fee"; and Dr. Slabisak would keep the remaining balance as an illegal remuneration in exchange for ordering from MPowerHealth.

63.    In 2023, OIG Advisory Opinion No. 23-05 outlined why this type of arrangement between Dr. Slabisak, Neurovital, and MPowerHealth was illicit.

64.    Upon information and belief, NMA approached Dr. Slabisak and convinced Dr. Slabisak to instead order IOM services from Defendants. Specifically, upon information and belief, NMA marketed an arrangement whereby Dr. Slabisak could still receive kickbacks for ordering IOM services, but NMA would purchase Neurovital so that Dr. Slabisak did not have to order services from an LLC he owned. Upon information and belief, NMA marketed this new arrangement as achieving compliance with the law.

65.    Dr. Slabisak agreed to this new arrangement with NMA. Accordingly, in or around June of 2023, NMA acquired Neurovital. Upon information and belief, Neurovital had no real value or assets, and existed solely as a channel through which Dr. Slabisak could funnel IOM kickbacks. Nevertheless, upon information and belief, NMA paid a sizable sum to Dr. Slabisak to acquire Neurovital. This was an additional improper payment by NMA to incentivize Dr. Slabisak to order IOM services from Defendants.

66.    Prior to NMA acquiring Neurovital in or around June of 2023, Dr. Slabisak had *never* ordered IOM services for one of his procedures from Defendants.

67.    However, after NMA acquired Neurovital, Dr. Slabisak started consistently–and, upon information and belief, almost exclusively—ordering IOM services from Defendants.

68.    This sudden uptick in ordering was due to the fact that Dr. Slabisak received a portion of collections for all IOM services that he referred to Defendants.

69.    HCSC has identified at least 88 different instances post-June of 2023 where Dr. Slabisak ordered IOM services from Defendants for surgical procedures Dr. Slabisak rendered to HCSC's members for which HCSC paid Defendants $842,797.22. These claims are tainted by kickbacks. Below are representative examples:

| Billing Provider | Submitted To | Claim Number | Date of Service | Amount Paid |
|---|---|---|---|---|
| Physician Oversight | BCBSTX | *******330X | 8/23/2024 | $█████ |
| Physician Oversight | BCBSTX | *******820X | 8/19/2025 | $█████ |
| Monitoring Associates | BCBSTX | *******930X | 12/11/2023 | $█████ |

70.     Had Defendants disclosed or had HCSC known about the illicit financial relationship between Dr. Slabisak and Defendants, HCSC would not have paid the claims above or other claims submitted by Defendants for services rendered during Dr. Slabisak's procedures.

***Dr. Navin Subramanian***

71.     Dr. Navin Subramanian is a spine surgeon who practices in or around the Greater Houston, Texas area.

72.     Upon information and belief, Dr. Subramanian previously had a relationship with one of NMA's IOM competitors, MPowerHealth, whereby Dr. Subramanian received remunerations for IOM services ordered from MPowerHealth.

73.     The relationship worked as follows. In January of 2016, Dr. Subramanian created an LLC under Texas law—NS Monitoring, PLLC ("NSM")—for which he was the Managing Member and Director.

74.     Shortly thereafter, NSM entered into a Management Services Agreement with an affiliate of MPowerHealth.

75.     Upon information and belief, Dr. Subramanian would then order IOM services for his procedures from NSM; MPowerHealth would actually provide the IOM services and bill payors for them; MPowerHealth would take some of the collections under the guise of a "management fee"; and Dr. Subramanian would keep the remaining balance as illegal remuneration in exchange for ordering from MPowerHealth.

76.     In 2023, OIG Advisory Opinion No. 23-05 outlined why this type of arrangement between Dr. Subramanian, NSM, and MPowerHealth was illicit.

77.     Upon information and belief, NMA approached Dr. Subramanian and convinced Dr. Subramanian to instead order IOM services from NMA. Specifically, upon information and belief, NMA marketed an arrangement whereby Dr. Subramanian could still receive kickbacks for ordering IOM services, but NMA would purchase NSM so that Dr. Subramanian did not have to order services from an LLC he owned. Upon information and belief, NMA marketed that this new arrangement as achieving compliance with the law.

78.     Dr. Subramanian agreed to this new arrangement with NMA. Accordingly, in or around August of 2023, NMA acquired NSM. Upon information and belief, NSM had no real value or assets, and existed solely as a channel through which Dr. Subramanian could funnel IOM kickbacks. Nevertheless, NMA paid a sizable sum to Dr. Subramanian to acquire NSM. This was an additional improper payment by NMA as means to incentive Dr. Subramanian to order IOM services from Defendants.

79.     Prior to NMA acquiring NSM in or around August of 2023, Dr. Subramanian had **never** ordered IOM services for one of his procedures from Defendants.

80.     However, after NMA acquired NSM, Dr. Subramanian started consistently–and, upon information and belief, almost exclusively—ordering IOM services from Defendants.

81.     This sudden uptick in ordering IOM services from Defendants was due to the fact that Dr. Subramanian received a portion of collections for all IOM services that he referred to Defendants.

82.     HCSC has identified at least 113 different instances post-June of 2023 where Dr. Subramanian ordered IOM services from Defendants for surgical procedures he rendered to

HCSC's members for which HCSC paid Defendants $344,345.46. These claims are tainted by kickbacks. Below are representative examples:

| Billing Provider | Submitted To | Claim Number | Date of Service | Amount Paid |
|---|---|---|---|---|
| Monitoring Associates | BCBSTX | ********410X | 10/25/2023 | $████ |
| Physician Oversight | BCBSTX | ********000X | 12/12/2023 | $█████ |
| Physician Oversight | BCBSTX | ********6J0X | 10/1/2024 | $█████ |

83.    Had Defendants disclosed or had HCSC known about the illicit financial relationship between Dr. Subramanian and Defendants, HCSC would not have paid the claims above or other claims submitted by Defendants for services rendered during Dr. Subramanian's procedures.

***Dr. Daniel Peterson***

84.    Dr. Daniel Peterson is a neurosurgeon who practices in or around the Austin, Texas area.

85.    Upon information and belief, Dr. Peterson previously had a relationship with one of NMA's IOM competitors, MPowerHealth, whereby Dr. Peterson received remunerations for IOM services ordered from MPowerHealth.

86.    The relationship worked as follows. On March 18, 2020, Dr. Peterson created an LLC under Texas law—Buffalo Neuromonitoring, PLLC ("Buffalo Neuromonitoring")—for which he was the Managing Member and Director.

87.    That same day, Buffalo Neuromonitoring entered into a Management Services Agreement with an affiliate of MPowerHealth.

88.    Upon information and belief, Dr. Peterson would then order IOM services for his procedures from Buffalo Neuromonitoring; MPowerHealth would actually provide the IOM

services and bill payors for them; MPowerHealth would take some of the collections under the guise of a "management fee"; and Dr. Peterson would keep the remaining balance as an illegal remuneration in exchange for ordering from MPowerHealth.

89.    In 2023, OIG Advisory Opinion No. 23-05 outlined why this type of arrangement between Dr. Peterson, Buffalo Neuromonitoring, and MPowerHealth was illicit.

90.    Upon information and belief, NMA approached Dr. Peterson and convinced Dr. Peterson to instead order IOM services from NMA. Specifically, upon information and belief, NMA marketed an arrangement whereby Dr. Peterson could still receive kickbacks for ordering IOM services, but NMA would purchase Buffalo Neuromonitoring so that Dr. Peterson did not have to order services from an LLC he owned. Upon information and belief, NMA marketed that this new arrangement as achieving compliance with the law.

91.    Dr. Peterson agreed to this new arrangement with NMA. Accordingly, in or around June of 2023, NMA acquired Buffalo Neuromonitoring. Upon information and belief, Buffalo Neuromonitoring had no real value or assets, and existed solely as a channel through which Dr. Peterson could funnel IOM kickbacks. Nevertheless, NMA paid a sizable sum to Dr. Peterson to acquire Buffalo Neuromonitoring. This was an additional improper payment by NMA as means to incentive Dr. Peterson to order IOM services from Defendants.

92.    Prior to NMA acquiring NSM in or around June of 2023, Dr. Peterson had *never* ordered IOM services for one of his procedures from Defendants.

93.    However, after NMA acquired NSM, Dr. Peterson started consistently—and, upon information and belief, almost exclusively—ordering IOM services from Defendants.

94.    This sudden uptick in ordering IOM services from Defendants was due to the fact that Dr. Peterson received a portion of collections for all IOM services that he referred to Defendants.

95.    HCSC has identified at least 189 different instances post-June of 2023 where Dr. Peterson ordered IOM services from Defendants for surgical procedures he rendered to HCSC's members for which HCSC paid Defendants $415,451.03. These claims are tainted by kickbacks. Below are representative examples:

| Billing Provider | Submitted To | Claim Number | Date of Service | Amount Paid |
|---|---|---|---|---|
| Physician Oversight | BCBSTX | ********C80X | 7/17/2023 | $▮ |
| Monitoring Associates | BCBSTX | ********650X | 1/22/2025 | $▮ |
| Physician Oversight | BCBSTX | ********610X | 11/25/2024 | $▮ |

96.    Had Defendants disclosed or had HCSC known about the illicit financial relationship between Dr. Peterson and Defendants, HCSC would not have paid the claims above or other claims submitted by Defendants for services rendered during Dr. Peterson's procedures.

***Dr. Vivek Kushwaha***

97.    Dr. Vivek Kushwaha is a neurosurgeon who practices in or around the Houston, Texas area.

98.    Upon information and belief, Dr. Kushwaha previously had a relationship with one of NMA's IOM competitors, MPowerHealth, whereby Dr. Kushwaha received remunerations for IOM services ordered from MPowerHealth.

99.    The relationship worked as follows. On December 17, 2015, Dr. Kushwaha created an LLC under Texas law—Medimetro, PLLC ("Medimetro")—for which he was the Managing Member.

100.    Shortly thereafter, Medimetro entered into a Management Services Agreement with an affiliate of MPowerHealth.

101.    Upon information and belief, Dr. Kushwaha would then order IOM services for his procedures from Medimetro; MPowerHealth would actually provide the IOM services and bill payors for them; MPowerHealth would take some of the collections under the guise of a "management fee"; and Dr. Kushwaha would keep the remaining balance as an illegal remuneration in exchange for ordering from MPowerHealth.

102.    In 2023, OIG Advisory Opinion No. 23-05 outlined why this type of arrangement between Dr. Kushwaha, Medimetro, and MPowerHealth was illicit.

103.    Upon information and belief, NMA approached Dr. Kushwaha and convinced Dr. Kushwaha to instead order IOM services from NMA. Specifically, upon information and belief, NMA marketed an arrangement whereby Dr. Kushwaha could still receive kickbacks for ordering IOM services, but NMA would purchase Medimetro so that Dr. Kushwaha did not have to order services from an LLC he owned. Upon information and belief, NMA marketed that this new arrangement as achieving compliance with the law.

104.    Dr. Kushwaha agreed to this new arrangement with NMA. Accordingly, in or around May of 2023, NMA acquired Medimetro. Upon information and belief, Medimetro had no real value or assets, and existed solely as a channel through which Dr. Kushwaha could funnel IOM kickbacks. Nevertheless, NMA paid a sizable sum to Dr. Kushwaha to acquire Medimetro. This was an additional improper payment to incentive Dr. Kushwaha to order IOM services from Defendants.

105.    Prior to NMA acquiring Medimetro in or around May of 2023, Dr. Kushwaha had ***never*** ordered IOM services for one of his procedures from Defendants.

106.    However, after NMA acquired Medimetro, Dr. Kushwaha started consistently—and, upon information and belief, almost exclusively—ordering IOM services from Defendants.

107.    This sudden uptick in ordering IOM services from Defendants was due to the fact that Dr. Kushwaha received a portion of collections for all IOM services that he referred to Defendants.

108.    HCSC has identified at least 85 different instances post-June of 2023 where Dr. Kushwaha ordered IOM services from Defendants for surgical procedures he rendered to HCSC's members for which HCSC paid Defendants $335,816.99. These claims are tainted by kickbacks. Below are representative examples:

| Billing Provider | Submitted To | Claim Number | Date of Service | Amount Paid |
|---|---|---|---|---|
| Physician Oversight | BCBSTX | ********E90X | 11/13/2023 | $ |
| Monitoring Associates | BCBSTX | ********100X | 4/18/2025 | $ |
| Physician Oversight | BCBSTX | 527450SZ7Q20X | 12/20/2024 | $ |

109.    Had Defendants disclosed or had HCSC known about the illicit financial relationship between Dr. Kushwaha and Defendants, HCSC would not have paid the claims above or other claims submitted by Defendants for services rendered during Dr. Kushwaha's procedures.

## BACKGROUND OF THE NO SUPRISES ACT

110.    Health benefit plans, such as those offered by HCSC, contract with healthcare providers, making the provider "participating" or "in network" for that plan.

111.    Provider network contracts set forth, among other things, rates at which the health benefit plan will reimburse the provider for covered services rendered for a plan member. These

rates apply instead of the "billed charges" a provider might otherwise hold out as the price for its services.

112.   When a member receives covered healthcare from an in-network provider, the member is typically only responsible for the payment of a co-pay, deductible, and/or co-insurance payment. The in-network provider is also prohibited from seeking charges from the patient in excess of the rates agreed upon in the network agreement.

113.   On the other hand, if a provider is "out of network," they have no network agreement with the applicable health plan. This means there is no agreed-upon rate for covered services rendered by an out-of-network provider, nor are there limits on what a provider may charge a patient for such services. Out-of-network providers often set rates that are entirely divorced from cost of care, market rates, or any other measure of reasonable value for the services.

114.   Out-of-network providers could historically "balance bill" patients for their excess charges above the plan's maximum allowed amount. And because providers set their rates unilaterally, the charges were often inflated, leading to patients receiving massive balance bills. Providers that balance billed patients could impose significant hardship on their patients, including bankruptcy.

115.   Balance bills became especially prevalent in instances where members could not choose to receive care from an in-network provider, such as emergency care. In other situations, the member may have chosen a network facility, but certain providers staffing the facility—like anesthesiologists—were out-of-network and billed separately.

116.   In both instances, out-of-network providers could "surprise" patients with huge balance bills. These balance bills were often inflated or were arbitrary amounts that had no relation to the cost of care, market rates, or any other measure of reasonable value for the services. And

often, patients would have no idea they had received care from an out-of-network provider until they received a balance bill for thousands of dollars.

117.    To combat predatory balance billing, Congress enacted the NSA in 2020 as an attempt to end "surprise medical bills."  Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020).

118.    The NSA was designed to: (1) shield patients from unexpected out-of-network bills, and (2) establish a payment that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[11]

119.    The NSA established the IDR Process for resolving payment disputes on claims between out-of-network providers and health plans. *See* 42 U.S.C. § 300gg-111(c).

120.    The IDR Process has strict eligibility requirements, including but not limited to the following:

a.    *First*, the IDR Process is not available where a "specified state law" applies—*i.e.*, a state law that provides a method for determining the total amount payable to an out-of-network provider for covered services that otherwise fall within the scope of the NSA, 42 U.S.C. § 300gg-111(a)(3)(I). One such instance is Texas's analogue to the NSA, Texas Senate Bill 1264 ("Texas State IDR Process").

b.    *Second*, the services and items at issue must be within the NSA's scope— meaning that the services must be rendered by an out-of-network provider rendering emergency services, non-emergency services at participating facilities, or air ambulance services. 42 U.S.C. § 300gg-111(c)(1)(B).

---

[11] *See* Office of Health Policy, Issue Brief, *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*, (Nov. 22, 2021), Available at:
https://aspe.hhs.gov/sites/default/files/documents/acfa063998d25b3b4eb82ae159163575/no-surprises-act-brief.pdf.

c.   *Third*, the services and items must not have been the subject of a previous award issued through the IDR Process. 42 U.S.C. § 300gg-111(c)(1)(B).

d.   *Fourth*, a provider[12] must comply with the statutorily ordered timeline for each step of the IDR Process, including:

      i.   Initiating open negotiation (an "Open Negotiation" period) via written notice as prescribed in the Provider Claim Summary, which must be given within 30 days of the health plan's first notice of payment or denial for the item or service. *See* 42 U.S.C. § 300gg-111(c)(1)(A).

      ii.   Exhausting the 30-day Open Negotiation period. *See* 42 U.S.C. § 300gg-111(c)(1)(B).

      iii.   Initiating a formal IDR dispute within four business days after exhaustion of the Open Negotiations period. 42 U.S.C. § 300gg-111(c)(1)(B).

e.   *Fifth*, a provider submitting multiple claims together (referred to as "batched" claims) must comply with batching criteria. 45 C.F.R. § 149.510(a)(2)(i) ("Batched items and services means multiple qualified IDR items or services that are considered jointly as part of one payment determination by a certified IDR entity for purposes of the Federal IDR process."). There is no limit on the number of services or items submitted together as one "batch."

121.   Generally, the IDR process works as follows:

---

[12] Either party may initiate the IDR Process, but the Process is overwhelmingly initiated by providers. *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Public Use Files for 2024 Q3 and Q4 (as of May 28, 2025), Available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

a.      Within 30 days of initial payment or notice of denial on a claim, the provider must provide written notice to initiate the "Open Negotiation" period with the applicable health benefits plan. 42 U.S.C. § 300gg-111(c)(1)(B);

b.      If the provider exhausts the 30-day Open Negotiation period and the parties do not agree upon a payment amount, the provider can then initiate the formal IDR Process through an online portal. The provider must initiate the formal IDR process within 4 days after the Open Negotiation period has lapsed. *Id*.;

c.      To initiate the formal IDR Process, the provider has to answer various questions on the online portal related to the medical items and services being disputed, then complete a Notice of IDR Initiation Form;

d.      The parties then select, or have appointed, an Independent Dispute Resolution Entity ("IDRE"). 42 U.S.C. § 300gg-111(c)(4)(F);

e.      The health plan has only four business days after the provider has initiated the formal IDR Process to object that the items or services in dispute are not eligible, regardless of whether the health plan is evaluating a single item or service, or a batch containing hundreds of items and services;[13]

f.      After being appointed, the IDRE has only three business days to submit its attestations to the U.S. Department of Health and Human Services, the Department of Labor, and the Department of the Treasury (hereinafter, the "Federal Government Agencies") (again, this deadline stands, regardless of the number of items/services or

---

[13] Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties, December 2023 Update to October 2022 Guidance, § 5.5, Available at: https://www.cms.gov/files/document/federal-independent-dispute-resolution-guidance-disputing-parties.pdf ("If the non-initiating party believes that the Federal IDR Process is not applicable, the non-initiating party must notify the Departments by submitting the relevant information through the Federal IDR portal . . . not later than 1-business-day after the end of the 3-business-day period for certified IDR entity selection").

batched items or services). To proceed forward in the dispute, the IDRE must attest that it does not have a conflict of interest, and that the IDRE has determined that the claims in dispute are eligible for the IDR Process. An IDRE who does not make this evaluation within the 3 business day period will be fired, will not be paid for their services evaluating the dispute's eligibility, and the parties must then select another IDRE.[14] 45 C.F.R. § 149.510(c)(1)(v), 29 C.F.R. § 2590.716-8(c)(1)(v);

g.      Regulations require the IDRE to "review the information submitted in the notice of IDR initiation"—which, as noted, contains only the attestations submitted by the provider, without any input from (or opportunity for rebuttal) from the health plan—and use the contents of the Notice of IDR Initiation "to determine whether the Federal IDR process applies." 45 C.F.R. § 159.510(b)(2)(iii) (contents of notice of IDR initiation do not include a non-initiating party's objections); 45 C.F.R. § 149.510(c)(1)(v) (requiring IDREs to review notice of IDR initiation, but not requiring review of any other documents from the IDR portal, or any other submissions from the non-initiating party)

h.      After the IDRE determines that the IDR Process applies, the provider and health plan each submit an "offer" to the IDRE, proposing the amount the provider should be paid for the out-of-network item or service. The parties are not entitled to see, nor rebut, each other's submissions to the IDRE. The parties must express their offers "both as a dollar amount and the corresponding percentage of the [QPA]" and provide additional required information. 42 U.S.C. § 300gg-111(c)(5)(B) (submission of offers); 45 C.F.R. § 149.510(c)(4)(i) (contents of offers);

---

[14] If the IDRE finds the claims in dispute are not eligible, the Process ends, and the IDRE is not paid. 42 U.S.C. § 300gg-111(c)(5)(F).

   i. The IDRE then selects one party's offer, taking into account the "qualifying payment amount" ("QPA"), which is the health benefit plan's median in-network rate for the same service, and other circumstances related to the provider and patient. The IDRE may **not** select any other amount for the award, regardless of how reasonable (or unreasonable) the parties' submissions are. 42 U.S.C. § 300gg-111(c)(5)(C);

   j. This decision is then binding upon the parties, subject to limited judicial review, and the non-prevailing party is responsible for administrative and IDRE fees. 42 U.S.C. § 300gg-111(c)(5)(F).

122. The IDR Process is costly. The IDREs that oversee this Process charge administrative fees, which are the responsibility of the party that loses the dispute. 42 U.S.C. § 300gg-111(c)(5)(F)(i). Often these administrative fees exceed the value of the underlying reimbursement dispute.

### **INITIATING FORMAL IDR PROCEEDINGS THROUGH THE IDR PORTAL**

123. To avoid the filing of ineligible disputes under the IDR Process, providers are required to provide information and attest that the service meets eligibility requirements when initiating a dispute.

124. As outlined below, it is nearly impossible to "accidentally" submit an ineligible claim to the IDR Process.

125. The IDR portal functionally operates under an "honor system," whereby the provider attests to the accuracy of their representations. The system contains built-in safeguards to prevent a provider from accidentally submitting a dispute that is ineligible for the IDR Process, but it does not have any mechanisms to verify the provider's representations, or otherwise detect or prevent fraudulent submissions.

126.    Once the open negotiation period discussed above has been exhausted, the process of initiating a dispute under the IDR begins with providers having to input information into an online portal created by HHS.[15]

127.    The portal's first page confirms a party initiating IDR must provide an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process":[16]

Along with the general information you'll need to start your Federal IDR dispute process, provide:
- Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
- Dates and location of qualified IDR items or services
- Type of qualified IDR items or services such as emergency services and post-stabilization services
- Codes for corresponding service and place-of-service
- Attestation that qualified IDR items or services are within the scope of the Federal IDR process
- Your preferred certified IDR entity

128.    Next, the provider must select the "Health Plan Type" from enumerated dropdown options, which are limited to those types of plans that are potentially eligible for the IDR Process:

---

[15] *See* Department of Health & Human Services, *Notice of IDR Initiation*, Available at: https://nsa-idr.cms.gov/paymentdisputes/s/.
[16] 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).



129.    In response to some selections, including for the selection of a certain type of benefits plan, the portal returns an alert about ineligibility; for instance:

⚠ **This dispute is not eligible for the federal IDR process because the date of service you provided is before 1/1/2022.**

130.    The last step in the Process is submission of the Notice of IDR Initiation form,[17] which contains information proscribed by HHS.

131.    Among other things, this form includes fields for the provider to complete, including information regarding the "Qualified IDR Item(s) or Service(s)":

---

[17] Departments of the Treasury, Labor, and Health and Human Services (Departments) and the Office of Personnel Management, *Notice of IDR Initiation Instructions*, OMB Control No. 1210-0169, Available at: https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

**[INFORMATION TO BE COMPLETED BY THE INITIATING PARTY]**

1. **Initiating party is (check one):**  ☐ **Plan** ☐ **Issuer** ☐ **FEHB Carrier** ☐ **Health care provider**
   ☐ **Health care Facility** ☐ **Provider of air ambulance services**

2. **Qualified IDR Item(s) or Service(s)** [insert additional rows as appropriate]

| | Description of qualified IDR item(s) or service(s) | Claim Number | Batched (Y/N) | Date of item(s) or service(s) | Location where item(s) or service(s) were furnished (include state) | Service code(s) | Place-of-service code(s) | Type of qualified item(s) or service(s) | Qualifying Payment Amount | Cost Sharing Amount Allowed | Initial Payment Amount for the item(s) or service(s), if applicable |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |

132.    The form also requires the provider to supply the "Name of the Plan/Issuer/Carrier" and to select the "Type of Plan" from an enumerated list:

3. **Group Health Plan/Health Insurance Issuer/FEHB Carrier Information**

Name of Plan/Issuer/Carrier: _____

Type of Plan (select one):

☐  Federal Employees Health Benefits (FEHB) plan:

If FEHB plan, enter 3-digit Enrollment Code: _____

☐  Individual health insurance plan

☐  Non-federal governmental plan (i.e., state and local government plan)

☐  Church plan

☐  Private employment-based group health plan (i.e., an ERISA plan)

If ERISA plan, is the ERISA plan self-insured? Y/N _____

☐  Unknown

**Contact Information**

133.    The provider must also include the date it commenced the open negation period:

5. **Indicate the commencement date of the open negotiation period:**
_____

134.    If submitting a "batched" dispute, the provider must comply with batching criteria; but, they may submit an unlimited number of services and items within one batch.

135.    Finally, the provider must sign and date an "**ATTESTATION**" that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process":

---

**8. ATTESTATION:**

___ I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

**Initiating Party (or Representative of the Initiating Party):** _____

**Print Name:** _____    **Date:** _____

---

136.    As noted, the Notice of IDR initiation contains only the attestations submitted by the provider; it does not include any input from (or opportunity for rebuttal) from the health plan. 45 C.F.R. § 159.510(b)(2)(iii).

## MISUSE AND ABUSE OF THE NSA IDR PROCESS

137.    When the NSA was passed in 2021, it was estimated that there would be approximately 17,435 disputes submitted to the IDR Process each year.[18] Those predictions turned out to be a drastic underestimation.

138.    Providers submitted 390,346 disputes to the IDR Process in the second half of 2023 alone. In 2024, they initiated 1.5 million disputes—a 300% year-over-year increase, and more than 70 times the aforementioned annual case load Congress anticipated.

---

[18] Requirements Related to Surprise Billing, 87 Fed. Reg. 52618 (Aug. 26, 2022) (Final rules under the No Surprises Act).

139.    Two factors are motivating providers to drive these excessive volumes: (1) providers winning a disproportionate amount of these disputes, and (2) the unreasonably high rates that providers are proposing as "offers" in the IDR Process.

140.    Data released by the Center for Medicare and Medicaid Services (CMS) shows that, for the second half of 2024, approximately 85% of IDR disputes were decided in favor of providers.[19] In the first half of 2025, providers won 88% of all IDR disputes.[20]

141.    Moreover, awards in favor of providers often far exceed market rates for the same services by the same types of providers. The IDR Process median awarded rate is now four times more than the QPA.[21] In other words, out-of-network providers who participate in the IDR Process are often getting four times more than the typical rates contracted providers receive for the same services in the same market.

142.    The additional costs associated with the IDR Process are "generating billions of dollars in extra costs for the healthcare system" without delivering more or better services to patients.[22]

143.    Researchers have commented that "absent corrective action from policymakers, patients will ultimately bear the cost, through higher premiums and the administrative overhead of an increasingly exploited arbitration process."[23]

---

[19] *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Public Use Files for 2024 Q3 and Q4 (as of May 28, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

[20] *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Public Use Files for 2025 Q1 and Q2 (as of February 9, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

[21] *See id.*

[22] Rebecca Pifer, HealthcareDive, *No Surprises dispute resolution is creating billions of dollars in extra costs, could raise premiums: analysis*, (Aug. 27, 2025), Available at: https://www.healthcaredive.com/news/no-surprises-dispute-resolution-driving-health-costs/758713/.

[23] Lawson Mansell & Sage Mehta, Niskanen Center, *New data shows No Surprises Act arbitration is growing healthcare waste*, (June 18, 2025), Available at: https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/.

## NMA DEFRAUDS HCSC IN THE NSA IDR PROCESS

144.    According to NMA, the enactment of the NSA was "the introduction of a new and radically game-changing statute in NMA's industry."[24]

145.    Indeed, NMA has stated that it believes the NSA was "a dramatic shift in favor of the provider from historical practices where out-of-network providers only had balance billing of the patient as leverage to receive an appropriate out-of-network rate."[25]

146.    NMA has also claimed that the NSA has "proved a great boon to NMA" and has been "very fruitful."[26]

147.    The draw of developing additional sources of revenue eventually became so great that NMA began using its affiliates, including Physician Oversight and Monitoring Associates, to initiate disputes under the NSA for *ineligible* services and items.

148.    To initiate the IDR process for ineligible services and items, Defendants have to make a series of misrepresentations in its submissions to the IDR portals—misrepresentations that are transmitted to HCSC, IDREs, and federal governmental bodies—to make an item or service appear eligible for the NSA (when it was not). These misrepresentations were made by Physician Oversight and Monitoring Associates at the direction of NMA. Specifically, Defendants have:

a.    Misrepresented the type of health benefit plan applicable to a given service;

b.    Misrepresented the type of medical services provided;

c.    Misrepresented the date that the medical services were provided;

d.    Misrepresented that the parties participated in an Open Negotiation period as well as the date of the Open Negotiation period;

---

[24] Plaintiff's Verified Complaint at ¶ 30, *NMA Holdings, LLC v. Shinn, et al.*, Cause No. 2024-0028 (Del. Ch. Jan. 11. 2024).
[25] *Id*. at ¶ 32.
[26] *Id*. at ¶ 38.

e.   Misrepresented that the provider filed an appeal with the health plan; and,

f.   Attested that the items or services are "qualified IDR items or services," and that they "are within the scope of the Federal IDR process" when Defendants knew, or should have known, that was not the case.

149.   Notably, HCSC often informs Defendants that an underlying item or service is ineligible for the IDR Process during the Open Negotiation Phase. Below is one such example of HCSC informing Defendants of ineligibility issues with services or claims during the Open Negotiation Phase:



March 28, 2024
RE: ███████████
Dear Physician Oversight Llc:

We have received your request on March 18, 2024, disputing claim number ███████████.

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable.  The health plan type is PREM.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

150.   Despite knowing, including after being told by HCSC, that the items and services are not eligible for the respective IDR Process, Defendants move ahead in initiating the formal IDR Processes by further misrepresenting to the IDREs that the items and services are eligible

when they are not. IDREs are required to evaluate each submission's eligibility for the IDR Process; but, not only are IDREs financially incentivized to find eligibility, they are also not statutorily required to consider any submissions besides the Notice of IDR Initiation (which contains only the provider's attestations, not the health plan's submissions or objections).

151.    Because of these misrepresentations, which are relied upon by HCSC and the IDREs, Defendants are able to illegally use the IDR Process for items and services not eligible for the IDR Process. As a result, Defendants procure awards, often at rates well above any reasonable market-competitive rate, for items and services that are not eligible under the NSA. HCSC is forced to continue participating in the IDR Process, even after HCSC has submitted an objection, as HCSC has no other choice; the IDR Process does not allow for traditional "appeals," and if HCSC stopped participating in the Process, a default award would simply be entered against it.

152.    HCSC is then forced to pay administrative fees in connection with these improperly granted awards. There are also significant overhead costs and expenses incurred by HCSC because of the volume of ineligible items and services.

153.    The end result of Defendants' fraudulent submissions of ineligible items and services to IDR disputes is that IDR awards and IDRE fees are levied against HCSC related to items and services that were not eligible for the NSA IDR Process in the first place.

154.    The following are just a few representative examples where Defendants improperly procured awards under the NSA IDR Process for ineligible items and services using fraudulent and false representations.

### DISP-461040 (State Specified Law Applies)

155.    On December 5, 2022, Physician Oversight provided services to a HCSC member with a fully insured health benefits plan.

156.    On April 7, 2023, HCSC sent Physician Oversight a provider claim summary, in addition to a standard "835" remittance advice, explaining that the services had been reimbursed at $█████. The provider claim summary stated that the services were subject to "Texas law" and that if Physician Oversight "disagree[d] with the payment amount, [it] can request mediation or arbitration" under the ***Texas State IDR Process***:

```
( 7).   UNDER THE TEXAS LAW,A MEMBER MUST NOT BE BILLED ABOVE THEIR COST-SHARE
        FOR NON-NETWORK ER CARE,FACILITY-BASED CARE OR LAB/DIAGNOSTIC IMAGING.
        IF YOU DISAGREE WITH THE PAYMENT AMOUNT, YOU CAN REQUEST MEDIATION OR
        ARBITRATION BY SUBMITTING A REQUEST AT WWW.TDI.TEXAS.GOV. ONCE
        SUBMITTED, PLEASE NOTIFY BCBSTX AT TX.PROVIDER.ARBITRATION@BCBSTX.COM.
```

157.    Nevertheless, Defendants initiated an open negotiation period for these services on May 3, 2023 in the ***Federal IDR Process***.

158.    In response, HCSC sent a letter explaining (again) that these services were ineligible for the Federal IDR Process:



**BlueCross BlueShield of Texas**

May 08, 2023
RE: ████████████
Dear Physician Oversight Llc:

We have received your request on May 03, 2023, disputing claim number ████████████.

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

Based on specified state law applicable to this claim, items or services billed do not qualify for the NSA process.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

159.    Still, Defendants initiated a formal Federal IDR Process on June 19, 2023. To do so, Defendants made material misrepresentations to make these services appear eligible when Defendants knew they were not.

160.    A representative of Defendants falsely attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process":

**Conflict of Interest Attestation**
☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

| Signature: | Date: |
|---|---|
| NATOYA JOHNSON | 06/19/2023 |

161.     This was untrue. Defendants had already received a provider claim summary and a letter from HCSC stating the service was ineligible for the Federal IDR Process.

162.     HCSC also submitted an objection to the IDR Dispute:

> DISP-461040 Objection: State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable for the following claims. Specific citation for the state law applicable to this item or service is Tex. Ins. Code 14677.001 et seq. (1467.051, 1467.082). ███████████████████

163.     Nevertheless, Defendants' misrepresentations caused an award to be rendered against HCSC in the amount of $██████.

164.     This award is over 1,178% greater than the QPA (i.e., median in-network rate) for these same services.

165.     On top of this, HCSC also incurred administrative expenses of $██████.

166.     All of the foregoing was caused by Defendants' fraudulent and false misrepresentations in the IDR Process.

### DISP-1965465 (Medicare Health Benefits Plan)

167.     On May 6, 2024, Physician Oversight provided services to a HCSC member with a Medicare health benefits plan, which is exempt from the IDR Process. HCSC reimbursed these services at $█████.

168.     Based on the member's health benefits plan card, the provider claim summary, and the "835" remittance advice, Defendants knew or should have known that this member had a Medicare health benefits plan, and the service was therefore ineligible for the IDR Process.

169.     Nevertheless, Defendants initiated an open negotiations period for these services on September 6, 2024.

170.    In return, HCSC sent a letter explaining that "the Member's coverage is through Medicare, Medicaid, Indian Health Services, Veterans Affairs Health Care, or TRICARE" so therefore "[t]he No Surprises Act IDR Process is not applicable":



BlueCross BlueShield of Texas

October 25, 2024
RE: ████████████████
Dear Physician Oversight Llc:

We have received your request on September 06, 2024, disputing claim number ████████████.

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined the Member's coverage is through Medicare, Medicaid, Indian Health Services, Veterans Affairs Health Care, or TRICARE. The No Surprises Act IDR Process is not applicable.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

171.    Still, Defendants initiated a formal IDR Process for these services. To do so, Defendants made material misrepresentations to make these services appear eligible when Defendants knew they were not.

172.    *First*, Defendants represented that the applicable health plan type was an "ERISA Plan Self Insured":

**Notice of IDR Initiation**    OMB Control Number: 1210-0169 Expiration Date: 06/30/2025

**Dispute Reference Number: DISP-1965465**

**Qualification Questions**

**Was the service in question provided prior to 1/1/2022?**
No

**I'm a(n):**
Health care provider

**Tax ID:**    **National Provider Identifier (NPI):**
850542512    1770111452

**Health Plan Type:**
Either partially or fully self-insured private (employment-based) group health plan

**ERISA Plan self insured**
Yes

**When did the open negotiation period start?**
09/06/2024

173.    This was untrue. From the provider claim summary, "835" remittance advice, and letter sent by HCSC, Defendants knew that the member had a Medicare health benefit plan. Nevertheless, Defendants submitted false information to make the claim appear eligible for the Federal IDR Process.

174.    *Second*, a representative of Defendants falsely attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process":



**Conflict of Interest Attestation**
☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

**Signature:**    **Date:**
Victoria Herauf    10/23/2024

175.    This, too, was untrue. Defendants had already received a letter from HCSC stating the service was ineligible for the IDR Process.

176.    HCSC submitted an objection to the IDRE explaining that the services being disputed were ineligible for the IDR Process:



> **If you attested to this statement, select one or more justifications to support why the items and services under dispute do not belong in the Federal IDR Process.**
>
> ✓ This dispute includes items or services under a coverage type not subject to the No Surprises Act,
>
> **\* Which items or services are under a coverage type not subject to the NSA and what coverage type(s) is the item or service under?**
>
> Objection to the following items or service which are under a coverage type not subject to the No Surprises Act Charge exceeds Medicare's reasonable amount. Therefore, this submission is not eligible for the Federal IDR Process. 02024164506805N0X
>
> ✓ Other,

177.    Defendants' misrepresentations caused an award to be rendered against HCSC in the amount of $███████.

178.    This award is over 1,300% greater than the QPA (i.e., median in-network rate) for these same services.

179.    On top of this, HCSC also incurred administrative expenses of $███.

180.    All of the foregoing was caused by Defendants' fraudulent and false misrepresentations in the IDR Process.

### DISP-1299633 (Failure to Timely Initiate & State Specified Law Applies)

181.    On November 20, 2023, Physician Oversight provided services to a HCSC member with a fully insured health benefits plan.

182.    Before HCSC even adjudicated the claims for these services, Defendants initiated an open negotiations period against HCSC for these services on March 18, 2024. This was improper—a provider may only commence an open negotiations period *after* notice of payment or denial.

183.    On March 27, 2024, HCSC sent Defendants a provider claim summary, in addition to a standard "835" remittance advice, explaining that the services had been reimbursed at $█████.

The provider claim summary stated that the services were subject to "Texas law" and that if Physician Oversight "disagree[d] with the payment amount, [it] can request mediation or arbitration" under the [*Texas State IDR Process*]":



```
( 6 ).  UNDER THE TEXAS LAW,A MEMBER MUST NOT BE BILLED ABOVE THEIR COST-SHARE
        FOR NON-NETWORK ER CARE,FACILITY-BASED CARE OR LAB/DIAGNOSTIC IMAGING.
        IF YOU DISAGREE WITH THE PAYMENT AMOUNT, YOU CAN REQUEST MEDIATION OR
        ARBITRATION BY SUBMITTING A REQUEST AT WWW.TDI.TEXAS.GOV. ONCE
        SUBMITTED, PLEASE NOTIFY BCBSTX AT TX.PROVIDER.ARBITRATION@BCBSTX.COM.
```

184.    HCSC also sent a letter explaining that these services were ineligible for the Federal IDR Process:

**BlueCross BlueShield**
of Texas

March 28, 2024
RE: ████████████████████
Dear Physician Oversight Llc:

We have received your request on March 18, 2024, disputing claim number
█████████████████.

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable.  The health plan type is PREM.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

185.    Still, Defendants initiated a formal Federal IDR Process on May 2, 2024. To do so, Defendants made material misrepresentations to make these services appear eligible when Defendants knew they were not.

186.    *First*, Defendants represented that the applicable health plan type was "[e]ither [a] partially or fully self-insured ERISA group health plan":

### Notice of IDR Initiation
OMB Control Number: 1210-0169 Expiration Date: 06/30/2025

**Dispute Reference Number: DISP-1299633**

**Qualification Questions**

**Was the service in question provided prior to 1/1/2022?**
No

**I'm a(n):**
Health care provider

**Tax ID:**
850542512

**National Provider Identifier (NPI):**
1770111452

**Health Plan Type:**
Either partially or fully self-insured private (employment-based) group health plan

**ERISA Plan self insured**
Yes

**When did the open negotiation period start?**
03/18/2024

187.    This was untrue. From the provider claim summary, "835" remittance advice, and letter sent by HCSC, Defendants knew that the member had a fully insured health benefit plan only subject to the Texas State IDR Process. Nevertheless, Defendants submitted false information to make the claim appear eligible for the Federal IDR Process.

188.    *Second*, a representative of Defendants falsely attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process":

**Conflict of Interest Attestation**

☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

**Signature:**
NATOYA JOHNSON

**Date:**
05/02/2024

189.    This, too, was untrue. Defendants had already received a provider claim summary and a letter from HCSC stating the service was ineligible for the Federal IDR Process.

190.    HCSC submitted an objection to the IDRE explaining that the services being disputed were ineligible for the IDR Process:

> Objection to the following items or services. State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable for the following claims. Specific citation for the state law applicable to this item or service is Tex. Ins. Code 14677.001 et seq.(1467.051, 1467.082).
> ██████████████, TX, Funding Type: Fully Insured

191.    Defendants' misrepresentations caused an award to be rendered against HCSC in the amount of $████.

192.    This award is over 750% greater than the QPA (i.e., median in-network rate) for these same services.

193.    On top of this, HCSC also incurred administrative expenses of $███.

194.    All of the foregoing was caused by Defendants' fraudulent and false misrepresentations in the IDR Process.

                              *        *        *

195.    The foregoing are examples of the many thousands of awards for ineligible services or items in the IDR Process that Defendants have caused against HCSC.

## COUNT I
## FRAUD
## (Against All Defendants)

196.    HCSC incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

197.    The submission of a claim for reimbursement to HCSC constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and

that the submitted claim did not knowingly or recklessly disregard or misrepresent or conceal material facts.

198.    The submission of a claim for reimbursement to HCSC also constitutes a certification and representation of compliance with the Kickback Laws and Policies.

199.    Each time Defendants submitted a claim or caused a claim to be submitted, Defendants represented that the underlying claim was true, accurate, and complete; did not knowingly or recklessly disregard or misrepresent or conceal material facts; and complied with the Kickback Laws and Policies.

200.    Yet these representations were false for the claims Defendants submitted or caused to be submitted to HCSC. Defendants knew that they had and would pay kickbacks to the referring providers which violated, among other things, the Kickback Laws and Policies.

201.    Defendants made these false representations and material omissions to induce HCSC's reliance so that HCSC would issue payments based on materially inaccurate information.

202.    Defendants also intended that their financial arrangements with referring providers remain hidden from HCSC and knew that they were not being disclosed in claims submitted or elsewhere to HCSC. Defendants knew that HCSC was ignorant of, or did not have the opportunity to discover, the kickback arrangements underlying the services.

203.    These misrepresentations and omissions were material. If these kickback arrangements had been disclosed, HCSC would not have paid the claims and instead would have treated them as nonpayable.

204.    HCSC was unaware of the falsity of the material representations contained in the claims when it made payments in justifiable reliance thereon. HCSC was also unaware of the

material information that was omitted from the claims when it made payments in justifiable reliance thereon.

205.    HCSC justifiably relies upon providers to make accurate and truthful representations and certifications when billing claims. In turn, providers intend for HCSC to rely on statements given in a claim form to determine payment. Because of the volume of claims that HCSC processes on a daily basis, the vast majority of claims are automatically adjudicated by claim-processing systems. Putting systems in place otherwise would dramatically increase the costs of healthcare for all and/or bring the entire system grinding to a halt.

206.    As a direct and proximate result of these misrepresentations, Defendants caused HCSC to suffer damages in an amount to be proven at trial, including but not limited to the amount that HCSC paid to Defendants for claims tainted by kickbacks.

## COUNT II
## FRAUD
## (Against All Defendants)

207.    HCSC incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

208.    As described above, Defendants repeatedly misrepresented material facts regarding the eligibility and information related to the eligibility of claims it submitted to the IDR Process, including entering misinformation into the IDR portal and completing and submitting forms. These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites had been satisfied and the dates of the same, whether any items or services within the claim were duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

209.    Defendants also falsely attested in the Notice of Initiation form, described above, that the IDR items or services were "within the scope of the Federal IDR process" when, in fact, they were not—including because they were tainted by kickbacks and violated the Kickback Laws and Policies.

210.    These misrepresentations were made by Defendants as result of a collective strategy, plan, and scheme.

211.    Defendants made these misrepresentations directly and/or indirectly to HCSC, the Federal Government Agencies, and IDREs.

212.    Defendants' misrepresentations were material. But for its misrepresentations, Defendants would not have been able to initiate (or prevail in) the IDR Process for ineligible items and services.

213.    Defendants made these misrepresentations with the intent of inducing HCSC, the Federal Government Agencies, and IDREs to rely upon them. Defendants made these misrepresentations both directly to HCSC, and indirectly to HCSC through Defendants' submissions to the Federal IDR Portal and to IDREs during the IDR Process.

214.    Defendants intended for HCSC to be induced into believing the underlying items and services were eligible for the IDR Process.

215.    Further, Defendants intended for those overseeing the IDR Processes—e.g., the Federal Government Agencies and IDREs—to rely upon Defendants' misrepresentations, communicate these misrepresentations to HCSC, and then take actions that were detrimental to HCSC as a result of this reliance. Specifically, Defendants intended that these entities and individuals allow the IDR Process to proceed on ineligible claims, and issue awards on ineligible claims.

216.    Had Defendants not made these misrepresentations, the IDR Process would not have proceeded on ineligible items and services; Defendants would not have been able to initiate formal IDR proceedings on ineligible items and services; HCSC would not have been trapped in IDR Processes for ineligible items and services (despite its eligibility objections); Defendants would not have been able to obtain awards for providers on ineligible items and services; and HCSC would not have been forced to incur unnecessary administrative fees, overhead costs, and other expenses to respond to Defendants' ineligible IDR Process submissions.

217.    As for the misrepresentations made to those overseeing the IDR Process, the Federal Government Agencies and IDREs reasonably and justifiably relied upon Defendants' submission of information and attestations that the underlying claims were eligible for the IDR Process. The IDR portal operates under an "honor system," and Defendants simply had to input information sufficient to overcome the technical safeguards in order to initiate formal IDR proceedings. HCSC was forced to rely on Defendants' fraudulent submissions, as HCSC had no other choice—the IDR Process does not allow for traditional "appeals," and if HCSC stopped participating in the Process, a default award would simply be entered against it.

218.    HCSC reasonably and justifiably relied upon Defendants' misrepresentations. After Defendants successfully induced the Federal Government Agencies and IDREs to rely upon its inaccurate eligibility attestations, HCSC was forced to rely upon Defendants' misrepresentations regarding claim eligibility. HCSC was the end target of Defendants' fraud, as Defendants specifically targeted HCSC's IDR disputes, with the intention of injuring HCSC and extracting unearned monies from HCSC through fraudulently-acquired IDR awards. HCSC was forced to rely on Defendants' fraudulent submissions, as HCSC had no other choice; failure to continue participating in the IDR Process would simply result in a default award entered against HCSC.

219.    Defendants made these misrepresentations with full knowledge of their falsity or with reckless disregard for their truth. Defendants had access to all necessary information regarding eligibility, such as the type of health plan and the date the services were rendered, to determine whether an item or service was ineligible for the IDR Process. Defendants also knew the underlying claims and services were tainted by kickbacks. Defendants ignored that information and instead submitted and attested to affirmative misrepresentations regarding the claims' eligibility in order to fraudulently initiate an Open Negotiation period pursuant to the IDR Process, taking advantage of the IDR portal's honor system.

220.    Defendants' misrepresentations also induced IDREs to permit disputes to move forward where items and services were ineligible for the IDR Process.

221.    As a direct and proximate result of these misrepresentations, Defendants caused HCSC to suffer damages in an amount to be proven at trial, including without limitation: IDR awards fraudulently procured against HCSC by Defendants for ineligible claims; administrative and IDRE fees and costs imposed on HCSC as part of the IDR Processes for ineligible claims; and costs for the overhead and resources necessary for HCSC to respond to IDR Processes initiated by Defendants for ineligible claims.

### COUNT III
### NEGLIENT MISREPRESENTATION
### <u>(Against All Defendants)</u>

222.    HCSC incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

223.    The submission of a claim for reimbursement to HCSC constitutes a certification and representation that the information shown on the claim is true, accurate, and complete, and

that the submitted claim did not knowingly or recklessly disregard or misrepresent or conceal material facts.

224.    The submission of a claim for reimbursement to HCSC also constitutes a certification and representation of compliance with the Kickback Laws and Policies.

225.    Each time Defendants submitted a claim or caused a claim to be submitted, Defendants represented that the underlying claim was true, accurate, and complete; did not knowingly or recklessly disregard or misrepresent or conceal material facts; and complied with the Kickback Laws and Policies.

226.    Yet Defendants negligently misrepresented those certifications to HCSC. Defendants knew or should have known that their arrangement with referring providers would violate, among other things, the Kickback Laws and Policies.

227.    Defendants also negligently misrepresented to HCSC why the IOM services were ordered and performed, failing to disclose the illegal kickback arrangements underlying the services.

228.    Defendants made these misrepresentations in their normal course of business.

229.    Defendants intended that their financial arrangements with referring providers remain hidden from HCSC and knew that they were not being disclosed in claims submitted or elsewhere to HCSC.

230.    Defendants' negligent misrepresentations were material. If these kickback arrangements had been disclosed, HCSC would not have paid the claims, and would have treated them as nonpayable.

231.    HCSC was unaware of the falsity of the material representations contained in the claims when it made payments in justifiable reliance thereon. HCSC was also unaware of the

material information that was omitted from the claims when it made payments in justifiable reliance thereon.

232.    HCSC justifiably relied on Defendants' false representations because Defendants were obligated to submit accurate information for valid claims applications and disclose material information. Because of the volume of claims that HCSC processes on a daily basis, the vast majority of claims are automatically adjudicated by claim-processing systems. Putting systems in place otherwise would dramatically increase the costs of healthcare for all and/or bring the entire system grinding to a halt.

233.    As a direct and proximate result of these misrepresentations, Defendants caused HCSC to suffer damages in an amount to be proven at trial, including the amount HCSC paid to Defendants for claims tainted by kickbacks.

**COUNT IV**
**NEGLIENT MISREPRESENTATION**
**(Against All Defendants)**

234.    HCSC incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

235.    As the examples herein show, Defendants repeatedly negligently misrepresented material facts regarding the eligibility of claims it submitted to both the IDR Processes, including while entering misinformation into portals and completing and submitting forms. These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites had been satisfied, whether the claim was duplicative of a prior dispute, and whether the provider filed an appeal with the health plan.

236.    Defendants negligently misrepresented in the Notice of Initiation form, described above, that the items or services were "within the scope of the Federal IDR process" when they were not.

237.    These misrepresentations were made by Defendants as a result of Defendants' strategy, plan, and scheme.

238.    Defendants made these misrepresentations directly or indirectly to HCSC, the Federal Government Agencies, and IDREs.

239.    Defendants' negligent misrepresentations were concerning existing, material facts. But for its misrepresentations, Defendants would not have been able to initiate IDR disputes for ineligible claims.

240.    Had Defendants not made these misrepresentations, the IDR Process would not have proceeded; the IDREs would not have inaccurately concluded that an ineligible claim was actually eligible; Defendants would not have been able to obtain awards on the ineligible claims; and HCSC would not have incurred IDRE and administrative fees, unnecessary overhead costs, and other expenses to respond to Defendants' ineligible IDR disputes.

241.    Defendants made these negligent misrepresentations in the course of their business and failed to exercise reasonable care or competence because Defendants were aware of the statements' falsity.

242.    Defendants had the relevant information available to them, such as the type of health plan, the date the services were rendered, and that the underlying services violated the Kickback Laws and Policies. Defendants submitted and attested to the accuracy of completely different information so that they could fraudulently initiate Open Negotiation periods and formal IDR disputes.

243.     HCSC reasonably and justifiably relied upon Defendants' misrepresentations. The IDR Process is built upon a presumption of accuracy and truthfulness of providers' representations. Thus, HCSC has to reasonably and justifiably rely upon Defendants' submission of information and attestations that the underlying services and claims were eligible for the IDR Process.

244.     As for the misrepresentations made to those overseeing the IDR Process, the Federal Government Agencies and IDREs reasonably and justifiably relied upon Defendants' submission of information and attestations that the underlying services and claims were eligible for the IDR Process. Once the IDRE made a determination of eligibility on Defendants' ineligible claims, based upon the IDRE's reliance upon Defendants' misrepresentations regarding those claims, the IDR Process was allowed to proceed. HCSC was then forced to rely upon Defendants' misrepresentations and to participate in the IDR Process.

245.     As a direct and proximate result of these misrepresentations, Defendants caused HCSC to suffer damages in an amount to be proven at trial, including without limitation: IDR awards fraudulently procured against HCSC by Defendants for ineligible claims; IDRE and administrative fees and costs imposed on HCSC as part of the IDR Processes; and forcing HCSC to bear the costs of the overhead and resources necessary to respond to IDR Processes initiated by Defendants for ineligible claims.

## COUNT V
## MONEY HAD AND RECEIVED
## (Against All Defendants)

246.     HCSC incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

247.     Defendants also caused HCSC to wrongfully pay claims that were tainted by kickbacks and that violated the Kickback Laws and Policies.

248.     Defendants also caused HCSC to wrongfully pay improper awards related to services that were ineligible for the IDR Process.

249.     Defendants directly received payments for these wrongful claims and IDR awards.

250.     HCSC would not have paid those claims but for the wrongful conduct of Defendants, as described herein.

251.     The funds paid by HCSC for improper claims and IDR awards should be returned in good conscience. Accordingly, HCSC seeks the return of money had and received by Defendants due to Defendants' improper and fraudulent conduct.

**COUNT VI**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(Against All Defendants)**

252.     HCSC incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

253.     HCSC seeks a declaration that Defendants' financial arrangement with referring providers and/or conduct in submitting claims for services tainted by kickbacks is unlawful. HCSC also seeks a declaration that these claims, including those that violate the Kickback Laws and Policies, are not payable. HCSC further seeks an injunction prohibiting Defendants from continuing to submit claims that are implicated by Defendants' illicit financial arrangement with referring providers that is described herein.

254.     HCSC also seeks a declaration that Defendants' conduct in submitting false attestations and initiating IDR Processes for ineligible items or services is unlawful. HCSC additionally seeks a declaration that IDR awards for such ineligible IDR items and or services are not binding. It further seeks an injunction prohibiting Defendants from continuing to submit false

attestations and initiate IDR Processes for items or services that are not eligible for IDR, or from seeking to enforce non-binding awards entered on items and services not eligible for IDR.

255.    HCSC faces imminent harm if Defendants' conduct is not enjoined. HCSC will suffer irreparable injury for which money damages will not suffice if Defendants' conduct is not enjoined. There is no adequate remedy at law to prevent the ongoing harm caused by Defendants' conduct.

**COUNT VII**
**VIOLATION OF RICO 18 U.S.C. § 1962(c) – IOM Referral Enterprise**
**(Against All Defendants)**

256.    NMA, Physician Oversight, Monitoring Associates, and the surgeons who made referrals to NMA and Physician Oversight ("Ordering Surgeons") and thereafter collected additional revenues as a result of services and items that NMA, Monitoring Associates, and Physician Oversight disputed in the IDR Process, formed an associated-in-fact enterprise (hereinafter, the "IOM Referral Enterprise"), which engaged in and affected interstate commerce. In doing so, NMA, Physician Oversight and Monitoring Associates violated 18 U.S.C. § 1962(c) because they conducted or participated, directly or indirectly, in the conduct of the IOM Referral Enterprise's affairs through a pattern of racketeering activities, including Wire Fraud (violations of 18 U.S.C. § 1343) and Commercial Bribery (violations of Tex. Penal Code § 32.43).

*The IOM Referral Enterprise*

257.    NMA, Physician Oversight, Monitoring Associates, and the Ordering Surgeons formed the IOM Referral Enterprise, as that term is defined in 18 U.S.C. § 1961(4), for the purposes of increasing Defendants' market share, increasing the volumes of IOM services being utilized, and stealing and defrauding funds from HCSC through the fraudulent submission of ineligible services and items in the IDR Process.

258.    The IOM Referral Enterprise achieved this by offering surgeons illicit kickbacks to refer services to NMA, Monitoring Associates, and Physician Oversight, and then improperly obtaining awards for ineligible services and items by making false certifications concerning the services and items' eligibility.

259.    The IOM Referral Enterprise members maintain relationships and links that allow them to achieve their shared purpose more effectively and successfully together than they ever could have done independently. NMA, Monitoring Associates, and Physician Oversight use illegal means to obtain referrals to provide IOM services that they would not obtain but for their financial arrangement with the Ordering Surgeons, and then NMA and Physician Oversight are able to access the IDR Process due to providing the IOM Services. The Ordering Surgeons are also able to gain additional compensation which they would not otherwise receive—including through the referral of IOM services to NMA, Monitoring Associates, and Physician Oversight, and then by way of receiving a portion of inflated, improper awards from the IDR Process.

260.    When the IDREs find in favor of NMA, Monitoring Associates, and Physician Oversight (based primarily on false representations) and select NMA, Monitoring Associates, and Physician Oversight's inflated amount as the award, NMA, Monitoring Associates, and Physician Oversight keeps a portion of the awards, and then sends a portion of it to the Ordering Surgeons. This allows NMA, Monitoring Associates, and Physician Oversight to keep ties with the Ordering Surgeons, increasing NMA, Monitoring Associates, and Physician Oversight's market share and the willingness of additional surgeons to become Ordering Surgeons. These financial ties and coordinated activities have now gone on for more than one year, and the IOM Referral Enterprise has had sufficient longevity to see through multiple cycles of illicit remuneration, services

performed, ineligible disputes submitted, inflated settlement demands submitted, and improper awards received, which are necessary to achieve its members' common purpose.

261.    The IOM Referral Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein—namely through NMA, Monitoring Associates, and Physician Oversight providing the Ordering Surgeons with clerical services, such as creating and maintaining records, negotiating and executing various agreements, and maintaining the bookkeeping and accounting functions necessary related to IOM services being provided.

### *RICO Persons*

262.    NMA is a "person" under 18 U.S.C. § 1961(3) because it is an entity registered to do business in Texas. It is associated with the IOM Referral Enterprise because it recruits the Ordering Surgeons, oversees the submission of ineligible services and items into the IDR Process, and pays the Ordering Surgeons a portion of collections received in pursuit of the IOM Referral Enterprise's scheme.

263.    Physician Oversight is a "person" under 18 U.S.C. § 1961(3) because it is an entity registered to do business in Texas. It is associated with the IOM Referral Enterprise because it bills payors and submits disputes for ineligible services and items into the IDR Process in pursuit of the IOM Referral Enterprise's scheme. Physician Oversight also allows NMA and the Ordering Surgeons to maintain separateness on paper.

264.    Monitoring Associates is a "person" under 18 U.S.C. § 1961(3) because it is an entity registered to do business in Texas. It is associated with the IOM Referral Enterprise because it bills payors and submits disputes for ineligible services and items into the IDR Process in pursuit of the IOM Referral Enterprise's scheme. Monitoring Associates also allows NMA and the Ordering Surgeons to maintain separateness on paper

265.    The Ordering Surgeons are distinct from the IOM Referral Enterprise. The Ordering Surgeons refer IOM services for their operations to NMA, Monitoring Associates, and Physician Oversight in exchange for receiving a percentage of collections from billing for the IOM services. Without the Ordering Surgeons referrals, NMA, Monitoring Associates, and Physician Oversight would not have IOM services to provide, nor the reimbursement of the same to challenge in the IDR Process.

266.    NMA, Physician Oversight, and Monitoring Associates all participated, directly or indirectly, in the establishment, management, orchestration, and maintenance of the IOM Referral Enterprise to commit thousands of acts of wire fraud—one each time they submit a claim to a payor that is tainted by kickbacks or submit a dispute into the IDR Processes for services and items that were ineligible, disputes which proceed because of false information and attestations transmitted by interstate wire.

267.    At all material times, the IOM Referral Enterprise was engaged in, and its activities affected, interstate commerce because NMA, Monitoring Associates, and Physician Oversight submit claims to payors and initiates the IDR Process for providers, including the Ordering Surgeons, located across the county. The members of the IOM Referral Enterprise also received funds from procuring awards against managed care companies and plan sponsors located across the country, including in Texas and Illinois.

### *Pattern of Racketeering Activities*

268.    NMA, Physician Oversight, Monitoring Associates, and the Ordering Surgeons intentionally and knowingly conducted and participated, directly and indirectly, in the conduct of the IOM Referral Enterprise's affairs through repeated related violations of 18 U.S.C. § 1343 (Wire Fraud) and Tex. Penal Code § 32.43 (Commercial Bribery).

269.    NMA, Physician Oversight, Monitoring Associates, and the Ordering Surgeons were each essential participants in the scheme to defraud HCSC that was executed through the IOM Referral Enterprise.

270.    NMA, Monitoring Associates, and Physician Oversight developed a web of Ordering Surgeons that they recruited and maintained relationships with because of the illicit kickbacks they offered for the referral of IOM services. This was essential to getting the volume needed to significantly scale submissions into the IDR Process. NMA, Monitoring Associates, and Physician Oversight also executed the scheme by submitting fraudulent attestations, inaccurate information, and ineligible submissions into the IDR Process.

271.    The Ordering Surgeons illicitly referred IOM services to NMA, Monitoring Associates, and Physician Oversight for their operations in exchange for receiving a portion of the collections of billing for those IOM services. Without these referrals, the IOM Referral Enterprise would not have any volume of claims to submit to payors or to the IDR Process.

### *Violations of 18 U.S.C. § 1343 (Wire Fraud)*

272.    NMA, Physician Oversight, Monitoring Associates, and the Ordering Surgeons knowingly and intentionally designed and executed schemes to defraud by means of false or fraudulent pretenses, representations, or promises, which involved and was furthered by transmitting writings via interstate wire communication networks, and which were designed and intended to defraud HCSC.

273.    The IOM Referral Enterprise was established to reap funds from HCSC and other payors through a pattern of fraudulent misrepresentations in claim submissions and the IDR Process. The Enterprise worked to deceive payors like HCSC to needlessly pay claims tainted by

kickbacks, and awards for disputes related to services and items that were ineligible for the IDR Processes, by means of fraud perpetrated over the wires.

274.    The IOM Referral Enterprise members' predicate acts of racketeering—which began no later than at least January of 2023, and have occurred continuously and systematically through the present day—committed by interstate wires, include: submitting claims to payors via wires; submitting disputes through the online IDR Process portals that were for services and items that were ineligible for the IDR Process; attesting to false statements; demanding outrageous settlement payments; and procuring payments from HCSC on services and items that were ineligible for the IDR Process via interstate wire. The fraudulent submissions used to obtain awards against HCSC comprise, in part, the pattern of racketeering activity identified through the date of this Complaint, and are described above in particular detail.

275.    These predicate acts of wire fraud occurred regularly since approximately January 2023, and included electronic communication relating to the IDR Process.

276.    NMA, Physician Oversight, Monitoring Associates, and the Ordering Surgeons each played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the IOM Referral Enterprise's goals.

277.    NMA is integral to this fraudulent scheme because it devised the scheme, funded the scheme's creation, recruited the Ordering Surgeons, oversaw the submission of claims and initiation of disputes in the IDR Process, and paid the Ordering Surgeons kickbacks.

278.    Physician Oversight and Monitoring Associates are integral to this fraudulent scheme because they submitted claims to payors and initiated disputes in the IDR Process. The submission of these claims and disputes  has also allowed NMA and the Ordering Surgeons to maintain separateness from one another so as not to raise suspicions.

279.     The Ordering Surgeons are integral to this fraudulent scheme because they referred IOM services to NMA, Monitoring Associates, and Physician Oversight so the submission of claims and disputes in the IDR Process would realize increased volumes.

280.     The IOM Referral Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the IOM Referral Enterprise functioned as a unit in pursuit of their common purpose.

281.     NMA, Physician Oversight, Monitoring Associates, and the Ordering Surgeons knowingly and intentionally caused the use of interstate wire communication networks to execute the scheme to defraud. A natural, necessary, and foreseeable consequence of the scheme to defraud was the electronic transmission, via interstate wire communication networks, of intentionally false, fraudulent, and misleading claim submissions and submissions to the IDR Process. Each submission listed in this pleading was transmitted via interstate wire, in furtherance of this scheme to defraud, and constitutes a separate violation of 18 U.S.C. § 1343.

282.     Through Physician Oversight and Monitoring Associates, the IOM Referral Enterprise received payment for the fraudulent claims from HCSC through the interstate wire facilities, in violation of 18 U.S.C. § 1343. Each such payment constituted a separate wire fraud violation. Each of these violations were related because they shared the common purpose of defrauding HCSC. HCSC suffered injuries every time they paid a claim tainted by kickbacks or for a dispute that was ineligible for the IDR Process, losing many millions of dollars as a result of the IOM Referral Enterprise's racketeering activity.

283.    The IOM Referral Enterprise profited substantially from the enterprise by receiving funds from HCSC. The IOM Referral Enterprise further damaged HCSC by forcing HCSC to incur needless administrative costs and overhead expenses.

### *Violations of Tex. Penal Code § 32.43 (Commercial Bribery)*

284.    Since approximately January of 2023, NMA, Physician Oversight, Monitoring Associates, and Ordering Surgeons committed numerous acts of Commercial Bribery, in violation of Texas Penal Code § 32.43.

285.    NMA, Monitoring Associates, and Physician Oversight have offered to pay, and paid, money to Ordering Surgeons with the intent to influence the Ordering Surgeons' treatment of their patients by incentivizing the Ordering Surgeons to refer their patients to NMA for IOM services. The details of payments to the Ordering Surgeons by Defendants are also uniquely (and intentionally) in Defendants' possession. As a result of the payments and offers to pay, the Ordering Surgeons did, in fact, make referrals to Defendants that form the basis for claims submitted to HCSC and for the initiation of ineligible disputes in the IDR Process.

286.    After receiving payment from HCSC, NMA, Monitoring Associates, and Physician Oversight conferred portions of the resulting payments to the Ordering Surgeons. These payments were also intended to incentivize Ordering Surgeons to increase the number of patient referrals to NMA for IOM services. This is all done with the intent to promote, manage, and carry on the Ordering Surgeons' violations of Texas Penal Code § 32.43.

### *The Pattern*

287.    These repeated, related violations of 18 U.S.C. § 1343 and Texas Penal Code § 32.43 constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

288.     The IOM Referral Enterprise members began to use the IOM Referral Enterprise to commit racketeering acts in or around January 2023 and have continued to the present day. During this multi-year period, the IOM Referral Enterprise members committed thousands of racketeering acts, which were not isolated incidents, but were separate, yet interrelated, acts forming a systematic and ongoing pattern.

289.     The racketeering acts were related because they had the same or similar purposes (obtaining money that the IOM Referral Enterprise members were not entitled to—namely reimbursements for claims tainted by kickbacks and IDR awards for ineligible services), results (harming HCSC, its plans, and its members), participants (the IOM Referral Enterprise members), victims (commercial payors, like HCSC, its plans, and members), and methods of commission (flooding the IDR Process with ineligible disputes by falsely certifying that the services, items, and/or claims were eligible for the IDR Process, and submitting artificially inflated offers to receive a windfall in any dispute for which it prevailed).

290.     Collectively, the thousands of violations of 18 U.S.C. § 1343 and violations of Texas Penal Code § 32.43, committed over this multi-year period, constitute both a closed-ended and open-ended continuity pattern of racketeering activity

### *RICO Injury*

291.     As a direct and proximate result of these racketeering activities and violations described herein, HCSC has been injured in its business and property by paying millions in awards, overhead, and administrative fees on ineligible services, items, and/or claims.

292.     HCSC is entitled to treble damages and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IIX
## VACATUR OF NSA IDR AWARDS UNDER 9 U.S.C. § 10
## (Against Physician Oversight and Monitoring Associates)

293.    HCSC incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

294.    The NSA allows a district court to vacate an IDR award in the following four circumstances:

a.  where the award was procured by corruption, fraud, or undue means;

b.  where there was evident partiality or corruption in the arbitrators, or either of them;

c.  where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

d.  where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

42 U.S.C. § 300gg–111 (c)(5)(E)(1) (adopting standards found at 9 U.S.C. § 10(a)).

295.    IDR determinations are only binding upon the parties involved "in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." 42 U.S.C. § 300gg-111(E)(i)(I).

296.    Since effectuation of the scheme described herein, Physician Oversight and Monitoring Associates have improperly initiated and received awards in thousands of IDR Processes.

297.    In doing so, Physician Oversight and Monitoring Associates and/or agents working on their behalf falsely attested to the Federal Government Agencies, IDREs, and HCSC that the

"item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process."

298.    The Federal Government Agencies and the IDREs relied on these attestations to determine that a submitted dispute was subject to and eligible for the IDR Process.

299.    These awards were each "procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). In initiating these IDR Processes, Physician Oversight and Monitoring Associates made material misrepresentations that services were eligible for the IDR Process even though Physician Oversight and Monitoring Associates knew or should have known that those services were ineligible for a variety of different reasons, including that no open negotiations period was ever initiated, that the formal IDR Process was not timely, and/or that the underlying services were not eligible under the NSA.

300.    Because of the nature of the IDR Process, which relies upon a provider's truthful and accurate attestations, Physician Oversight and Monitoring Associates were able to procure awards on these ineligible services and items as a result of the misrepresentation and false attestations.

301.    These awards also amount to the IDREs "exceed[ing] their powers." 9 U.S.C. § 10(a)(4).

302.    Specifically, as outlined above, the NSA details strict eligibility and timing requirements for when a service or item is eligible for an IDR Process.

303.    The IDR entities reasonably relied upon Physician Oversight and Monitoring Associates' misrepresentations, including but not limited to the false attestation that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal

IDR process." This induced the IDREs to "exceed their powers" and render awards on services and items not subject to the NSA in the first instance.

304.    In sum, the NSA IDR awards procured by Physician Oversight and Monitoring Associates' "corruption, fraud, and undue means" run contrary to the purpose of the NSA and have driven the costs of healthcare up for all, without any justification. Likewise, due to Physician Oversight and Monitoring Associates' misrepresentations, the IDREs rendering these awards "exceeded their powers" by issuing awards in the IDR Process for ineligible services and items.

305.    Accordingly, the Court should vacate all NSA IDR awards fraudulently obtained by Physician Oversight and Monitoring Associates.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff HCSC demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, HCSC respectfully requests a judgment in its favor granting the following relief:

    a.    An award of compensatory damages in an amount to be proven at trial;

    b.    An award of punitive and exemplary damages;

    c.    Equitable and declaratory relief, as requested herein;

    d.    Costs;

    e.    Reasonable attorney fees;

    f.    Prejudgment and post-judgment interest; and

    g.    An award of any other relief in law or equity that the Court deems just and proper.

Dated: February 18, 2026

By: */s/ Geoff Culbertson*

**PATTON, TIDWELL & CULBERTSON**

Kelly B. Tidwell
Texas Bar No. 20020580
Geoffrey P. Culbertson
Texas Bar No. 24045732
2800 Texas Boulevard
PO Box 5398
Texarkana, TX 75505
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
kbt@texarkanalaw.com
gpc@texarkanalaw.com

&

**ROBINS KAPLAN LLP**

Jamie R. Kurtz* (Lead Attorney)
JKurtz@RobinsKaplan.com
Nathaniel J. Moore*
NMoore@RobinsKaplan.com
John K. Harting
JHarting@RobinsKaplan.com
Kyle D. Nelson*
KNelson@RobinsKaplan.com
Jacqueline R.D. Fielding*
JFielding@RobinsKaplan.com
Lindsay K. Dreyer*
LDreyer@RobinsKaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
P: 612.349.8500

*Application for *pro hac vice* admissions
forthcoming

*Attorneys for Plaintiff Health Care Service*

*Corporation*