# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TEXARKANA DIVISION

| | | |
|---|---|---|
| Health Care Service Corporation, a Mutual Legal Reserve Company, | § § § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | Case No.: 5:26-cv-00022-RWS-JBB |
| Neuromonitoring Associates, LLC, Physician Oversight, LLC, and Monitoring Associates LLC, | § § § § § | ORAL ARGUMENT REQUESTED |
| *Defendants.* | § § | |

## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND REQUEST FOR JUDICIAL NOTICE

John M. Pickett
Texas Bar No. 15980320
**LAW OFFICES OF
JOHN M. PICKETT**
4122 Texas Blvd.
Texarkana, TX 75503
Telephone: (903) 794-1303
Fax: (903) 792-5098
jpickett@jpickettlaw.com

Matthew L. Knowles (*pro hac vice*) (Lead attorney)
Asseret Frausto (*pro hac vice*)
Carolyn Zaccaro (*pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 535-4000
Fax: (617) 535-3800
mknowles@mcdermottlaw.com
afrausto@mcdermottlaw.com
czaccaro@mcdermottlaw.com

R. Bray McDonnell (*pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
500 N Capitol Street NW
Washington, D.C. 20001
Telephone: (202) 756-8000
Fax: (202) 756-8087
rmcdonnell@mcdermottlaw.com

June 18, 2026

*Attorneys for Defendants*

**TABLE OF CONTENTS**

I.   **Introduction and Summary of the Argument** ................................................................. 1

II.  **Background and Procedural History** ........................................................................... 5

    A.   NMA and IOM services ................................................................................ 5

    B.   The NSA and IDR process ............................................................................ 6

    C.   HCSC's efforts to use litigation to re-write the NSA ............................................. 8

III. **Legal Standard** ...................................................................................................... 9

IV.  **Argument** ........................................................................................................... 10

    A.   Federal law and Fifth Circuit precedent bar the judicial review that HCSC seeks under its NSA Theory. .......................................................... 10

    B.   HCSC's claim for vacatur under the FAA fails. ..................................................... 13

        1.   HCSC fails the procedural requirements for vacatur. .............................. 14

        2.   HCSC fails the substantive standard for vacatur. .................................... 16

    C.   The Court lacks subject-matter jurisdiction as to HCSC's other theories too. ....................................................................................... 22

    D.   HCSC's fraud claims fail. ............................................................................ 24

    E.   HCSC's RICO claims fail. .......................................................................... 36

        1.   The RICO claim based on the NSA Theory fails. ................................... 36

        2.   The RICO claim based on the Practice-Acquisition Theory fails ............. 38

    F.   The Court should dismiss HCSC's claims for money had and received. ............. 43

    G.   HCSC's declaratory judgment counts and requests for injunctive relief fail. .................................................................................................... 44

V.   **Conclusion** ......................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acker v. Tarr*,
486 F.2d 654 (7th Cir. 1973) ...............................................................................12

*Aetna Health Inc. v. Radiology Partners, Inc.*,
2026 WL 1556164 (M.D. Fla. Apr. 16, 2026)................................................. *passim*

*Allen v. Hays*,
812 F. App'x 185 (5th Cir. 2020) .........................................................................27

*Allstate Indem. Co. v. Bhagat*,
164 F.4th 426 (5th Cir. 2026) ..............................................................................10

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ...........................................................................38

*Am. Postal Workers Union, AFL–CIO v. U.S. Postal Serv.*,
52 F.3d 359 (D.C. Cir. 1995)...............................................................................19

*Am. Realty Trust, Inc. v. Travelers Cas. & Sur. Co. of Am.*,
362 F. Supp. 2d 744 (N.D. Tex. 2005) .................................................................34

*Anthem Blue Cross Life & Health Ins. Co. v. HaloMD LLC*,
2026 WL 982629 (C.D. Cal. Apr. 9, 2026) ..................................................... *passim*

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006).............................................................................................12

*Arruda v. Curves Int'l, Inc.*,
861 F. App'x 831 (5th Cir. 2021) .....................................................................25, 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................9, 10

*Barahona v. Dillard's, Inc.*,
376 F. App'x 395 (5th Cir. 2010) ....................................................................3, 18, 19

*Baylor Health Care Sys. v. Equitable Plan Servs., Inc.*,
955 F. Supp. 2d 678 (N.D. Tex. 2013) ...............................................................3, 14

*Baylor Scott & White v. Project Rose MSO, LLC*,
633 S.W.3d 263 (Tex. Ct. App. 2021) ................................................................43, 44

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................10, 29

*Bible v. United Student Aid Funds, Inc.*,
    799 F.3d 633 (7th Cir. 2015) ........................................................................................42

*BNSF R.R. Co. v. Alstom Transp., Inc.*,
    777 F.3d 785 (5th Cir. 2015) ........................................................................................21

*Boyle v. United States*,
    556 U.S. 938 (2009)............................................................................................42, 43

*Brunig v. Clark*,
    560 F.3d 292 (5th Cir. 2009) ........................................................................................43

*CADG Erwin Farms, LLC v. Ipour*,
    2024 WL 1394501 (N.D. Tex. Mar. 31, 2024) ...........................................36, 37, 38

*California v. Texas*,
    593 U.S. 659 (2021).......................................................................................................45

*Conn. Gen. Life Ins. Co. v. Elite Ctr. for Minimally Invasive Surgery LLC*,
    2017 WL 607130 (S.D. Tex. Feb. 15, 2017) ...............................................................45

*Corey v. N.Y. Stock Exch.*,
    691 F.2d 1205 (6th Cir. 1982) ......................................................................................14

*Ctr. for Biological Diversity v. Bernhardt*,
    946 F.3d 553 (9th Cir. 2019) ........................................................................................12

*Cypress Home Care, Inc. v. Qlarant Integrity Sols., LLC*,
    2020 WL 10317439 (E.D. Tex. Mar. 18, 2020) (Schroeder, J.)............................26

*Cypress/Spanish Ft. I, L.P. v. Pro. Serv. Indus., Inc.*,
    814 F. Supp. 2d 698 (N.D. Tex. 2011) ........................................................................10

*DAC Surgical Partners P.A. v. United Healthcare Servs., Inc.*,
    2016 WL 7177881 (S.D. Tex. Dec. 8, 2016)...............................................................45

*Diamond Resorts Int'l, Inc. v. Aaronson*,
    2018 WL 735627 (M.D. Fla. Jan. 26, 2018)...............................................................37

*In re: DuPuy Orthopaedics, Inc.*,
    2016 WL 6271465 (N.D. Tex. Jan. 5, 2016) ..............................................................31

*Earl v. Boeing Co.*,
    53 F.4th 897 (5th Cir. 2022) ................................................................................. *passim*

iii

*Elliott v. Foufas*,
867 F.2d 877 (5th Cir. 1989) ....................................................................................42

*In re EpiPen Direct Purchaser Litig.*,
2023 WL 2860858 (D. Minn. Apr. 10, 2023)..........................................................41

*Frye v. Anadarko Petroleum Corp.*,
953 F.3d 285 (5th Cir. 2019) ....................................................................................44

*Garber v. Sir Speedy, Inc.*,
1996 WL 734947 (N.D. Tex. Dec. 11, 1996) .............................................2, 3, 14

*U.S. ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................................................................................26

*Guardian Flight, L.L.C. v. Health Care Serv. Corp.*,
140 F.4th 271 (5th Cir. 2025) .....................................................................................8

*Guardian Flight, L.L.C. v. Med. Evaluators of Tex. ASO, L.L.C.*,
140 F.4th 613 (5th Cir. 2025) .............................................................. *passim*

*Guardian Flight LLC v. Aetna Life Ins. Co.*,
No. 3:24-cv-00680 (D. Conn. June 16, 2026), Dkt. 389.................................2, 11, 12

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*,
512 F.3d 742 (5th Cir. 2008) ....................................................................................13

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
552 U.S. 576 (2008).................................................................................................15

*Blue Cross Blue Shield of Texas v. HaloMD, LLC*,
No. 5:25-CV-132-RWS, 2026 WL 1557492 (E.D. Tex. May 22, 2026)......................... *passim*

*Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chicago*,
747 F.2d 384 (7th Cir. 1984) ....................................................................................38

*HCB Fin. Corp. v. McPherson*,
8 F.4th 335 (5th Cir. 2021) ........................................................................38, 39, 40

*In re Insurance Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010).....................................................................................43

*Jackson v. Radcliffe*,
795 F. Supp. 197 (S.D. Tex. 1992) ...........................................................................32

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
546 S.W.3d 648 (Tex. 2018)......................................................................24, 25, 26, 27

*Kim v. Kimm*,
  884 F.3d 98 (2d Cir. 2018).............................................................................................36

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994).........................................................................................................9

*Legion Ins. Co. v. Ins. Gen. Agency, Inc.*,
  822 F.2d 541 (5th Cir. 1987) .........................................................................................15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................4, 22, 23

*Marmet Health Care Ctr., Inc. v. Brown*,
  565 U.S. 530 (2012).......................................................................................................13

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007).......................................................................................................44

*Momentum Glob. FZ LLC v. Kairos Glob. Trade, LLC*,
  2026 WL 807337 (S.D. Tex. Mar. 24, 2026)................................................................25

*Montanans For Multiple Use v. Barbouletos*,
  568 F.3d 225 (D.C. Cir. 2009) ......................................................................................12

*Morgan Keegan & Co. v. Garrett*,
  495 F. App'x 443 (5th Cir. 2012) ........................................................................ *passim*

*Moses H. Cone Mem'l Hosp. v. Mercury Constr.*,
  460 U.S. 1 (1983)...........................................................................................................21

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*,
  898 F.3d 461 (5th Cir. 2018) .........................................................................................28

*Nuvasive Clinical Servs., Inc. v. Neuromonitoring Assocs., LLC*,
  No. 1:18-cv-4304 (N.D. Ill. Mar. 15, 2019) .................................................................30

*O.R. Secs., Inc. v. Professional Plan. Assocs., Inc.*,
  857 F.2d 742 (11th Cir. 1988) ..................................................................................14, 15

*Orix Credit Alliance, Inc. v. Wolfe*,
  212 F.3d 891 (5th Cir. 2000) .........................................................................................44

*Oxford Health Plans LLC v. Sutter*,
  569 U.S. 564 (2013).......................................................................................................21

*Pace v. Cirrus Design Corp.*,
  93 F.4th 879 (5th Cir. 2024) ..........................................................................................25

v

*Partners & Friends Holding Corp. v. Cottonwood Minerals L.L.C.*,
  653 F. Supp. 3d 344 (N.D. Tex. 2023) ...................................................................44

*Patterson v. Mobil Oil Corp.*,
  335 F.3d 476 (5th Cir. 2003) .................................................................................39

*Peacock v. AARP, Inc.*,
  181 F. Supp. 3d 430 (S.D. Tex. 2016) ...................................................................10

*Pershing, L.L.C. v. Kiebach*,
  819 F.3d 179 (5th Cir. 2016) ...................................................................................9

*Phillips v. Collin Cmty. Coll. Dist.*,
  630 F. Supp. 3d 828 (E.D. Tex. 2022)......................................................................9

*Pickett v. Tex. Tech Univ. Health Scis. Ctr.*,
  37 F.4th 1013 (5th Cir. 2022) .........................................................................10, 30

*Polnac v. City of Sulphur Springs*,
  555 F. Supp. 3d 309 (E.D. Tex. 2021)......................................................................9

*Preston L. Firm, L.L.P. v. Mariner Health Care Mgmt. Co.*,
  2009 WL 10680007 (E.D. La. June 10, 2009)........................................................26

*Price v. Pinnacle Brands, Inc.*,
  138 F.3d 602 (5th Cir. 1998) ...........................................................................39, 40

*Raney v. Allstate Ins. Co.*,
  370 F.3d 1086 (11th Cir. 2004) .............................................................................37

*Reach Air Med. Servs. LLC v. Kaiser Found. Health Plan Inc.*,
  160 F.4th 1110 (11th Cir. 2025) .......................................................................16, 17

*Reardon v. Am. Airlines, Inc.*,
  167 F.4th 294 (5th Cir. 2026) ...................................................................................9

*Republic of Kazakhstan v. Stati*,
  380 F. Supp. 3d 55 (D.D.C. 2019)..........................................................................37

*Reule v. Jackson*,
  114 F.4th 360 (5th Cir. 2024) .................................................................................24

*Rivera v. Wyeth-Ayerst Lab'ys*,
  283 F.3d 315 (5th Cir. 2002) .....................................................................22, 23, 40

*Saeed v. Bennett-Fouch Assocs., LLC*,
  2012 WL 13026741 (N.D. Tex. Aug. 28, 2012)......................................................10

vi

*Sampson v. Murray*,
   415 U.S. 61 (1974)...............................................................................................45

*Sebelius v. Auburn Reg'l Med. Ctr.*,
   568 U.S. 145 (2013).............................................................................................12

*Sec. Data Supply, LLC v. Nortek Sec. & Control LLC*,
   2019 WL 3305628 (N.D. Tex. July 22, 2019).......................................................25

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985).............................................................................................38

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
   833 F.3d 512 (5th Cir. 2016) ...............................................................36, 37, 38, 41

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016).............................................................................................22

*Spurlock v. Johnson*,
   94 S.W.3d 655 (Tex. Ct. App. 2002) ....................................................................45

*Taylor v. Charter Med. Corp.*,
   162 F.3d 827 (5th Cir. 1998) ................................................................................30

*Tex. Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc.*,
   955 F.3d 482 (5th Cir. 2020) ................................................................................13

*U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
   125 F.3d 899 (5th Cir. 1997) ...........................................................................10, 26

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021).............................................................................................23

*U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*,
   188 F. Supp. 2d 358 (S.D.N.Y. 2002), *aff'd*, 51 F. App'x 66 (2d Cir. 2002)..........15

*U.S. Trinity Energy Servs., L.L.C. v. Se. Directional Drilling, L.L.C.*,
   135 F.4th 303 (5th Cir. 2025) ..........................................................................16, 21

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
   Walgreen Co.*,
   719 F.3d 849 (7th Cir. 2013) ................................................................................42

*United HealthCare of Pa., Inc. v. Northstar Anesthesia of Pa., LLC*,
   2026 WL 1145885 (E.D. Pa. Apr. 28, 2026)......................................................2, 11

*United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*,
   484 U.S. 29 (1987)...............................................................................................16

*United States v. Bruno*,
  809 F.2d 1097 (5th Cir. 1987) ............................................................................36

*United States v. Pendergraft*,
  297 F.3d 1198 (11th Cir. 2002) ................................................................36, 37, 38

*United States v. Rashan*,
  2026 WL 962444 (S.D.N.Y. Apr. 9, 2026)........................................................27

*United States v. Tarango*,
  396 F.3d 666 (5th Cir. 2005) ..............................................................................27

*Valentine Sugars, Inc. v. Donau Corp.*,
  981 F.2d 210 (5th Cir. 1993) ..............................................................................21

*Walker v. Beaumont Indep. Sch. Dist.*,
  938 F.3d 724 (5th Cir. 2019) ..............................................................................10

*Webb v. Everhome Mortg.*,
  704 F. App'x 327 (5th Cir. 2017) ......................................................................26

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)..........................................................................................45

*Wilkinson-Okotie v. Gonzales*,
  185 F. App'x 327 (5th Cir. 2006) ......................................................................12

*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*,
  90 F.3d 118 (5th Cir. 1996) ................................................................................30

**Statutes**

9 U.S.C. § 6..........................................................................................................14

9 U.S.C. § 10.................................................................................................. *passim*

9 U.S.C. § 12.................................................................................................3, 14, 15

18 U.S.C. § 1961 ...................................................................................................42

18 U.S.C. § 1962....................................................................................................38

18 U.S.C. § 1964...........................................................................................39, 40, 42

28 U.S.C. § 2201...............................................................................................44, 45

42 U.S.C. § 300gg-22 ..............................................................................................8

42 U.S.C. § 300gg-111 ..................................................................................... *passim*

42 U.S.C. § 300gg-134 ...................................................................................................8

42 U.S.C. § 1320a-7b...............................................................................................6, 32

Tex. Health & Safety Code § 311.0025 .......................................................................33

Tex. Occ. Code § 102.001 ......................................................................................32, 33

Tex. Occ. Code § 102.003 ............................................................................................32

Tex. Penal Code § 1.05 .................................................................................................34

Tex. Penal Code § 6.03 .................................................................................................31

Tex. Penal Code § 32.43 ...................................................................................... *passim*

## Other Authorities

45 C.F.R. § 149.510...................................................................................7, 17, 21, 22

Fed. R. Civ. P. 7...........................................................................................................14

Fed. R. Civ. P. 9...........................................................................................................10

Fed. R. Civ. P. 12...........................................................................................................9

H. Rep. 116-615 (2020) .................................................................................................8

*Illicit*, Black's Law Dictionary (12th ed. 2024)..........................................................33

**MOTION TO DISMISS AND REQUEST FOR JUDICIAL NOTICE**

Defendants Neuromonitoring Associates, LLC ("NMA"); Monitoring Associates, LLC; and Physician Oversight, LLC (together, "Defendants") move to dismiss Plaintiff Health Care Service Corporation ("HCSC")'s amended complaint (Dkt. No. 40) ("AC") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Defendants also request that the Court take judicial notice of the undisputed contents of the government forms and documents attached as Ex. 1–5.

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

In this case, HCSC offers three fraud theories, but each fails at the pleading stage. Bundling three deficient theories together in one complaint does not bolster any of them. This case should be dismissed with prejudice under Rules 12(b)(1) and 12(b)(6).

**The first theory (the "NSA Theory") is foreclosed by Judge Schroeder's ruling in *HaloMD*.** *Blue Cross Blue Shield of Texas v. HaloMD, LLC*, No. 5:25-CV-132-RWS, 2026 WL 1557492 (E.D. Tex. May 22, 2026) ("*HaloMD*"). This theory invokes RICO and state-law claims to seek review of No Surprises Act ("NSA") arbitration awards. But this is precisely the theory that the Court rejected in *HaloMD*. In light of that ruling, HCSC concedes it pleads these claims only to preserve them for appellate review. *See* AC at 38 n.24.

Indeed, in *HaloMD*, the Court held that the "NSA forecloses judicial review." 2026 WL 1557492, at *3. And *HaloMD* is indistinguishable: in both cases, the same affiliated plaintiff entities advanced the same theory through the same counsel, and both cases fail for the same reasons. In holding that the NSA bars judicial review, the Court reasoned that "inherent in the NSA's bar of judicial review of payment determinations is a limitation on the review of eligibility decisions" and that Blue Cross's claims were "an impermissible collateral attack on the [independent dispute resolution ("IDR")] awards." *Id.* at *4. The Court's decision was unequivocal and dismissed the case with prejudice for lack of subject-matter jurisdiction. Absent an intervening

1

decision from the Fifth Circuit, the same outcome should follow here.[1]

The only addition to the NSA Theory here is a count seeking vacatur under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10. *See* AC at Count XI, p. 72 ("VACATUR OF NSA AWARDS UNDER 9 U.S.C. § 10"). HCSC asks the Court to vacate "thousands" (AC ¶ 220) of arbitration awards. It does not list or identify the thousands of arbitrations in question, state who the parties were, plead when they happened, or offer the required facts and evidence to show why they must be vacated. This fails both procedurally and substantively. The statute that HCSC invokes (9 U.S.C. § 10) expressly requires an "application" (not merely a complaint) filed by a "party to the arbitration" (which HCSC is not) and it must be supported by "clear and convincing evidence" (of which HCSC offers none). 9 U.S.C. § 10; *Morgan Keegan & Co. v. Garrett*, 495 F. App'x 443, 447 (5th Cir. 2012); *Garber v. Sir Speedy, Inc.*, 1996 WL 734947, at *4–5 (N.D. Tex. Dec. 11, 1996) ("The requirement to present such applications by motion rather than in the form

---

[1] Indeed, while HCSC and its affiliates have been filing these cases across the country, each court to rule on the theory to date has rejected it. *See Anthem Blue Cross Life & Health Ins. Co. v. HaloMD LLC*, 2026 WL 982629, at *7–10 (C.D. Cal. Apr. 9, 2026) (holding that Blue Cross plaintiffs failed to satisfy vacatur under the FAA where, as here, they "objected to eligibility for all the sample determinations identified in the" complaint but lost on this issue at arbitration, essentially "plead[ing] itself out of court"); *Aetna Health Inc. v. Radiology Partners, Inc.*, 2026 WL 1556164, at *3–4 (M.D. Fla. Apr. 16, 2026) (rejecting an insurance company's request to relitigate IDR arbitration awards that it called "fraud" based on arguments that it raised or could have raised during the arbitration and rejecting the insurance company's effort to use other statutes and causes of action "to end-around the NSA and FAA strictures," and held that use of state law to do so is preempted); *United HealthCare of Pa., Inc. v. Northstar Anesthesia of Pa., LLC*, 2026 WL 1145885, at *12–14 (E.D. Pa. Apr. 28, 2026) (holding that the court lacked jurisdiction over the insurer's common-law fraud claim where it sought equitable relief, recognizing that the insurer made "essentially the same arguments" as "rejected in *Anthem*," *supra*, and reasoning that the insurer was "trying to evade Congress's policy choices in limiting judicial review because UnitedHealthcare believes the [NSA] leaves it with an inadequate remedy"); Order at 7–11, *Guardian Flight LLC v. Aetna Life Ins. Co.*, No. 3:24-cv-00680 (D. Conn. June 16, 2026), Dkt. 389 ("*Guardian Flight III*") (granting motion to dismiss claims premised on eligibility for IDR because the NSA provides for an "exclusive procedure" to challenge awards and allowing the claims would "permit a workaround to the barrier to plenary judicial review Congress imposed").

2

of a complaint is founded upon the fundamental policy of the FAA to provide for expedited judicial review by preventing the losing party from relitigating the matter by means of filing a new suit in federal court." (citations omitted)). This procedural requirement has an important policy rationale: a party cannot file a notice-pleading complaint and then use discovery to investigate thousands of unidentified arbitrations in hopes of gathering the evidence needed to make its "application" later. *See Baylor Health Care Sys. v. Equitable Plan Servs., Inc.*, 955 F. Supp. 2d 678, 688 n.1 (N.D. Tex. 2013); *Garber*, 1996 WL 734947, at *4–5. And the FAA requires that such applications be filed within three months of the arbitration, which HCSC fails to do here. 9 U.S.C. § 12. Put simply, seeking blanket and summary vacatur of thousands of unidentified arbitrations flunks every requirement of the statute that Count XI invokes.

Nor does HCSC meet the substantive test for showing fraud that could not have been raised during the arbitration, or that any particular arbitrator exceeded its powers. *See* 9 U.S.C. § 10(a). In fact, not only does HCSC fail to plead facts to meet any of these four scenarios for review under the FAA, it includes allegations that categorically rule them out. It is a brightline rule under the NSA and FAA that the losing side in an arbitration cannot relitigate the matter in court simply by alleging that the other side's arguments were fraudulent, particularly where the losing side knew about and raised the same objections in the arbitration. *See Guardian Flight, L.L.C. v. Med. Evaluators of Tex. ASO, L.L.C.*, 140 F.4th 613, 620–21 (5th Cir. 2025) ("*Guardian Flight II*"); *Barahona v. Dillard's, Inc.*, 376 F. App'x 395, 397–98 (5th Cir. 2010); *Anthem*, 2026 WL 982629, at *8. Likewise, that the arbitrator reached a decision that HCSC disagrees with does not mean that the arbitrator exceeded its powers; the losing side in any arbitration could try that argument, which is why precedent squarely rejects it.

\* \* \*

3

**HCSC's second theory (the "Practice-Acquisition Theory") relies on rhetoric to disguise why it fails as a matter of law.** The following is HCSC's theory: years prior, NMA's *competitors* had arrangements to provide intraoperative neuromonitoring ("IOM") services where the surgeons owned the IOM companies to which they referred work. AC ¶¶ 42–43. A government agency opined that the competitors' approach could violate federal law as to claims submitted to the federal government. AC ¶¶ 44–46. After that, some surgeons sold their IOM companies to the Defendants, AC ¶¶ 49, and some did not switch to new providers, AC ¶¶ 78, 91, 104, 117. HCSC labels these corporate acquisitions as "kickbacks" and says they violate Texas law. AC ¶¶ 54, 65.

To be clear, HCSC does not allege a single instance where it claims IOM was not medically necessary, where HCSC was charged at a different price, or any other way in which the practice acquisitions affected it or harmed it, or that HCSC would be situated differently if those acquisitions had not happened or the surgeons' or the Defendants' businesses were structured differently. Instead, HCSC argues that the structure of the practice acquisitions violates Texas law. But HCSC does not have standing to litigate this: it has not suffered a concrete injury that is traceable to the challenged conduct. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Earl v. Boeing Co.*, 53 F.4th 897, 903 (5th Cir. 2022) (no injury and no standing where passengers alleged they would not have bought tickets on an airplane that did not satisfy regulatory standards).

And there is another problem: the Texas laws that HCSC cites do not provide a private right of action. HCSC cannot sue under them directly, and has not attempted to do so here. Instead, it relies on a multi-step fraud theory: "The submission of a claim for reimbursement to HCSC also ***constitutes*** a certification and representation of compliance" with certain HCSC "Kickback Policies" which in turn supposedly require compliance with Texas law. AC ¶ 224 (emphasis added). The word "constitutes" does too much work in this sentence. Fraud is a lie, and there are

4

no facts alleged to show a lie here. HCSC has not pleaded what the Defendants actually said that was false. It references "representations made on a claim form," AC ¶ 32, but never says what they are, notwithstanding its obligation under Rule 9(b) to plead with specificity. As HCSC notes, NMA submits claims using "standard healthcare 'claims forms'" (an example of this government form is attached as Exhibit 4). AC ¶¶ 29–32. For example, these forms make no representation about NMA's corporate structure or compliance with HCSC's policies. In short, its fraud count fails for lack of fraud.

*    *    *

**Last, HCSC adds a third theory (the "Credentialing Theory") that amounts to no more than a vague rumor.** According to an unnamed source, "some" IOM services were performed by providers who were either not licensed in the right state or not credentialed at the right hospital. It says that the Defendants use a "primary" and "secondary" reader for each IOM case. AC ¶ 124. While HCSC does not dispute that the primary reader was always licensed and credentialed, it says that sometimes the secondary reader was not credentialed or licensed in the relevant hospital or geography. *Id.* But only one reader is required, and HCSC has not pleaded a single case where either the secondary reader was not licensed or credentialed, or the primary reader did not in fact perform the reading. HCSC lacks standing here too. And it has pleaded no facts or details whatsoever, despite the requirements of Rule 9(b). This claim amounts to nothing more than a rumor based on anonymous sources. *See* AC ¶ 128. This unsupported addition, haphazardly grafted onto the amended complaint, does not even satisfy the lower bar of Rule 8.

II.    BACKGROUND AND PROCEDURAL HISTORY

A.    **NMA and IOM services**

IOM services are procedures that monitor neural pathway integrity (i.e., nerve and brain function) in real time during certain neurosurgical, orthopedic, and vascular surgeries. AC ¶ 33.

5

This involves off-site neurologists monitoring nerve function during surgeries. AC ¶ 36. There is no allegation or dispute about the medical necessity of these services, or that they were performed safely to proper standards.

NMA provides IOM services to independent surgeons nationwide. AC ¶ 39. To that end, NMA operates through several entities that furnish IOM services to doctors and file claims for reimbursement from insurance companies for their work. AC ¶¶ 14–16. Defendants Physician Oversight, LLC and Monitoring Associates, LLC are two such entities. AC ¶¶ 15–16.

Rather than using an outside company like NMA, some surgeons refer IOM work to companies that they own. But in 2023, the federal Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG") issued Advisory Opinion No. 23-05, finding that self-referral to *surgeon-owned* IOM providers might violate the federal anti-kickback statute (which applies to claims for reimbursement submitted to the federal government, 42 U.S.C. § 1320a-7b) because the doctors own the companies to which they refer work. AC ¶¶ 42–44. After the OIG opinion,[2] NMA expanded its business by acquiring IOM companies that were previously owned by surgeons, so that they could be operated in compliance with the opinion. AC ¶¶ 47–49.

**B.      The NSA and IDR process**

Congress enacted the NSA to address surprise "balance bills" for out-of-network medical services. AC ¶¶ 137–138. The NSA included IDR, an arbitration process for "resolving payment disputes on claims between out-of-network providers and health plans." AC ¶ 140. There are three primary steps in IDR: open negotiations between the provider and the health insurer, IDR submissions, and then a binding payment determination by arbitrators known as Independent

---

[2] HCSC asserts that NMA requested that OIG issue the opinion. AC ¶ 47. This assertion is both false (and indeed, is pleaded without a good-faith basis under Rule 11(a)) and irrelevant to this motion.

Dispute Resolution Entities ("IDREs"). 42 U.S.C. § 300gg-111(c); AC ¶ 142.

When a dispute arises over the payment amount for an out-of-network service covered by the NSA, either the medical provider or insurer initiates negotiations with the other side. 42 U.S.C. § 300gg-111(c)(1)(A); AC ¶ 141.d n.12. If they cannot agree on a payment amount within thirty days, either party can then initiate the IDR arbitration process. *See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i). A provider or insurance company initiates the IDR process through an online portal. AC ¶ 147. After a party initiates IDR, the parties select an IDRE (i.e., an arbitrator). AC ¶ 142.d. If they cannot agree on an IDRE, one will be appointed by HHS, a government agency. *Id.*; *see also* 42 U.S.C. § 300gg-111(c)(4)(F).

The amended complaint acknowledges that the first step of the IDR process is for the arbitrator to determine whether the claim is eligible for IDR. AC ¶¶ 142.f, 142.g, 142.h. The arbitrators are expressly authorized and indeed required to make this determination. AC ¶¶ 142.f, 142.g; *see also* 45 C.F.R. § 149.510(c)(1)(v). If the non-initiating party disagrees that a dispute is eligible, it can submit an objection to HHS, the Department of Labor, the Department of the Treasury, and the IDRE. *Anthem*, 2026 WL 982629, at *7. The IDRE reviews both the initiating party's notification of IDR initiation and the non-initiating party's objection before deciding eligibility. Ex. 1, *Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties*, CMS.gov § 5.5 (2023); *see also* Ex. 2, *Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities*, CMS.gov 10–11 (2022). A dispute only moves forward—and there can only be an award—if the IDRE determines that it is eligible.

If the IDRE determines that the dispute is eligible, each party proposes a payment amount. AC ¶ 142.h. The IDRE then selects an offer it finds to be most reasonable, which is the amount the insurer must pay, based on criteria laid out in the NSA. *See* 42 U.S.C. § 300gg-111(c)(5)(B),

7

(c)(5)(C). This is "baseball" style arbitration, where the IDRE must select between the two sides' offers and pick the one that is most reasonable under specified statutory factors. *See* H. Rep. 116-615, at 56–57 (2020). The IDRE may not consider the medical provider's usual or customary rates in determining the most reasonable offer. 42 U.S.C. § 300gg-111(c)(5)(D). Instead, the *only* factors that an IDRE may consider are the qualifying payment amounts ("QPAs"), information requested by the IDRE relating to the offers made, information provided by the parties relating to the offers, the provider's background and market share, the patient's acuity, the scope of services offered by the provider, and demonstrations of good faith efforts between the provider and insurer to enter into network agreements. *Id.* § 300gg-111(c)(5)(C).

**The remedy for violating IDR rules is government enforcement, not private RICO litigation.** As the Fifth Circuit has held, "HHS has the authority to enforce provider and payor non-compliance with the NSA's provisions." *Guardian Flight, L.L.C. v. Health Care Serv. Corp.*, 140 F.4th 271, 274 (5th Cir. 2025) ("*Guardian Flight I*") (citing 42 U.S.C. § 300gg-22(b)(2)(A) and stating that the statute "provid[es] for HHS enforcement against some payors for NSA non-compliance," and citing 42 U.S.C. § 300gg-134(b) and stating that the statute "provid[es] for HHS enforcement against providers for NSA non-compliance").

## C.    HCSC's efforts to use litigation to re-write the NSA

HCSC is a large mutual legal reserve company that provides health insurance plans and administrative services for groups such as employers and governmental entities in five states. AC ¶ 13. Unhappy with its results during the IDR process, HCSC and its related Blue Cross entities have begun to flood the courts with collateral attacks on these rulings in federal district courts. This present case is part of HCSC's litigation campaign.

Here, HCSC filed its original complaint on February 19, 2026, and the Defendants moved to dismiss on April 21, 2026. As the motion to dismiss was pending, the Defendants moved to stay

8

discovery given the weakness of HCSC's claims and the strength of the dispositive motion. Dkt. 32. This Court also decided *HaloMD* during this period. Two days before it was set to respond to the Defendants' motion to dismiss, HCSC filed the amended complaint rather than respond in opposition to the motion to dismiss. Dkt. 45, at 2. The next day, the Court granted the motion to stay discovery and held that the original motion to dismiss was moot. *Id*. at 5; Dkt. 42.

## III.    LEGAL STANDARD

The Defendants move to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Under Rule 12(b)(1) a court must dismiss a case where it lacks subject-matter jurisdiction. "It is to be presumed that a cause lies outside [a federal court's] limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Pershing, L.L.C. v. Kiebach*, 819 F.3d 179, 181 (5th Cir. 2016) (alteration in original) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "There are two types of attacks against a court's subject-matter jurisdiction: 'facial' and 'factual.'" *Reardon v. Am. Airlines, Inc.*, 167 F.4th 294, 299 (5th Cir. 2026) (citation omitted). Here, the absence of subject-matter jurisdiction is apparent on the face of the amended complaint. *See id.*

Under Rule 12(b)(6), a court must dismiss a complaint that "fails to state a claim upon which relief can be granted." *Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 321 (E.D. Tex. 2021). A complaint must be "plausible on its face." *Phillips v. Collin Cmty. Coll. Dist.*, 630 F. Supp. 3d 828, 833 (E.D. Tex. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Though courts take the facts alleged in the light most favorable to the plaintiff, legal conclusions and recitations of claim elements are not enough. *Iqbal*, 556 U.S. at 678.

The plausibility standard demands "more than a sheer possibility that a defendant has acted

9

unlawfully." *Peacock v. AARP, Inc.*, 181 F. Supp. 3d 430, 433 (S.D. Tex. 2016) (quoting *Iqbal*, 556 U.S. at 678). "[F]actual allegations that are 'merely consistent with a defendant's liability, stop short of the line between possibility and plausibility of entitlement to relief,' and are thus inadequate." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (citation omitted). **Rather, the plausibility standard "requires" that the plaintiff plead facts demonstrating "that there is no 'obvious alternative explanation' for the decision" that is lawful.** *Pickett v. Tex. Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1034 (5th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 682); *see also Guardian Flight II*, 140 F.4th at 622 ("A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and obvious alternative explanation." (citation omitted)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007).

Fraud claims must meet a higher pleading standard. Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (citation omitted); *accord Allstate Indem. Co. v. Bhagat*, 164 F.4th 426, 434 (5th Cir. 2026). Moreover, a plaintiff must also allege facts with respect to each defendant's participation in the fraud, and cannot simply make generic allegations against multiple defendants together. *Cypress/Spanish Ft. I, L.P. v. Pro. Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 711 (N.D. Tex. 2011); *Saeed v. Bennett-Fouch Assocs., LLC*, 2012 WL 13026741, at *4 (N.D. Tex. Aug. 28, 2012).

## IV.    ARGUMENT

**A.    Federal law and Fifth Circuit precedent bar the judicial review that HCSC seeks under its NSA Theory.**

Congress created IDR as a non-judicial system "for resolving payment disputes." AC

10

¶ 140. In doing so, it restricted judicial review of IDREs' determinations, except in very narrow circumstances. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Though HCSC attempts to avoid this bar, this Court has explicitly recognized the restriction and rejected HCSC's theory in *HaloMD*. *See* 2026 WL 1557492, at *3 ("The Court agrees with Defendants that the NSA forecloses judicial review."). In fact, every court to consider the same or a closely related issue has adopted Defendants' position: the NSA does not allow for judicial review under this theory. *See Anthem*, 2026 WL 982629, at *7–10; Order at 7–11, *Guardian Flight III*, No. 3:24-cv-00680; *Aetna, Inc.*, 2026 WL 1556164, at *3–4; *UnitedHealthCare of Pa., Inc.* 2026 WL 1145885, at *12–14. HCSC recognizes this reality, and concedes that this Court's ruling in *HaloMD* "forecloses some of Plaintiff's claims based on" its IDR theory allegations. AC at 38 n.24.

The NSA states that a "determination of a certified IDR entity under subparagraph (A) . . . shall not be subject to judicial review, except in a case described in any of paragraphs (1) through (4) of section 10(a)" of the FAA. 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II). Section 10(a) of the FAA sets out the grounds for vacatur, which are based on whether the award was procured as a result of "corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), or where the arbitrator was at fault either by corruption, misconduct, or exceeding their powers, *id.* § 10(a)(2)–(4). And "Subparagraph A" refers to a previous section of the NSA that contains all the IDRE's work. 42 U.S.C. § 300gg-111(c)(5)(A), (E)(i)(II); *HaloMD*, 2026 WL 1557492, at *3–4 ("[I]nherent in the NSA's bar of judicial review of payment determinations is a limitation on the review of eligibility decisions."); *Anthem*, 2026 WL 982629, at *9 ("[S]ubparagraph (A) refers to 'a determination for a qualified IDR item or service.' An IDRE's payment determination necessarily includes a determination of eligibility." (internal citations omitted)).

This is jurisdictional. Where Congress makes a clear statement restricting judicial review,

11

it limits the subject-matter jurisdiction of the courts. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006); *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153–54 (2013). Where—as here—Congress states a determination is not subject to judicial review, the bar is jurisdictional. *See Wilkinson-Okotie v. Gonzales*, 185 F. App'x 327, 328 (5th Cir. 2006) (describing a provision precluding judicial review as a "jurisdictional bar"); *see also Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019) (analyzing statute providing that no determination under a certain law "shall be subject to judicial review"); *Montanans For Multiple Use v. Barbouletos*, 568 F.3d 225, 229 (D.C. Cir. 2009) (same as to a statute providing that "no determination" under a certain process "shall be subject to judicial review"); *Acker v. Tarr*, 486 F.2d 654, 656 (7th Cir. 1973) (finding no jurisdiction where the statute provides for "[n]o judicial review" except in limited circumstances).

The only plausible reading of § 300gg-111(c)(5)(E)(i)(II) of the NSA is that it bars judicial review of the IDRE's rulings, no matter what cause of action a plaintiff might invoke to challenge them. This Court agrees, having held that "the NSA prevents this Court from reviewing the . . . IDR awards at issue in [p]laintiff's suit." *HaloMD*, 2026 WL 1557492, at *3. It also rejected HCSC's argument that the statute bars only IDRE's payment determinations, not eligibility determinations, reasoning that "inherent in the NSA's bar of judicial review of payment determinations is a limitation on the review of eligibility determinations" because "[i]f the Court were to conclude that the items and services submitted for payment by Defendants were ineligible under the NSA, then the ultimate payment awards would necessarily be called into question." *Id.* at *4; *see also Anthem*, 2026 WL 982629, at *7; Order at 9, *Guardian Flight III*, No. 3:24-cv-00680 (acknowledging that counterclaims premised on fraudulent attestations of eligibility "would require judicial review of multiple IDR determinations" because the conduct "is inextricably tied

12

to those determinations"). The same reasoning applies to HCSC's claims.

Even outside the NSA's strict limitations on judicial review, courts nationwide, including the Fifth Circuit, make clear that the losing side of an arbitration cannot invoke other claims—like RICO or state-law fraud—to challenge the arbitration ruling where the "relationship between the alleged wrongdoing, purported harm, and arbitration award" underscores that a plaintiff seeks "to remedy wrongdoing that [FAA] Section 10 was meant to address." *Tex. Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 488–89 (5th Cir. 2020); *Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 751 (5th Cir. 2008); *HaloMD*, 2026 WL 1557492, at *2; *cf. Aetna*, 2026 WL 1556164, at *4 ("The FAA preempts state law claims that would otherwise frustrate its purpose." (citing *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012))).

*HaloMD* answers the question here. There, this Court held that Blue Cross of Texas' claims for common-law fraud, negligent misrepresentation, fraudulent inducement, money had and received, RICO, and declaratory and injunctive relief were "impermissible collateral attacks" even where the Blue Cross plaintiff sought administrative fees, costs, expenses, and equitable relief alongside its request for damages, which the court noted were "largely co-extensive with the losses it generally sustained in the form of IDR awards decided against it." *Id.* at *5. This Court also recognized that the alleged harm—"economic harms as a result of the fees, costs, and time that must be (wrongly) allocated to the IDR process for [] ineligible submissions"—is intertwined with the ultimate award. *Id.* at *6.

Thus, the Court's inquiry should end here, and it should dismiss Counts II, IV, VI, VIII, and X because (1) the Court lacks subject-matter jurisdiction under the NSA, and (2) even if it had jurisdiction, the claims constitute prohibited collateral attacks on the IDR awards.

**B.    HCSC's claim for vacatur under the FAA fails.**

Count XI attempts to invoke the only exception to the NSA's bar on judicial review. It

13

seeks vacatur under the FAA, expressly invoking 9 U.S.C. § 10. *See* AC ¶¶ 335–349. But Count XI fails both the procedural and substantive requirements of the FAA.

      1.      **HCSC fails the procedural requirements for vacatur.**

The statute that HCSC invokes, 9 U.S.C. § 10, states that in certain circumstances, "the United States court in and for the district wherein the award was made may make an order vacating the award ***upon the application*** of any party to the arbitration[.]" *Id.* (emphasis added). Thus, this statute expressly requires an "application," not a complaint. *Id.*; *see also O.R. Secs., Inc. v. Professional Plan. Assocs., Inc.*, 857 F.2d 742, 745 (11th Cir. 1988); *Baylor Health Care Sys.*, 955 F. Supp. 2d at 688 n.1; *Garber v. Sir Speedy, Inc.*, 1996 WL 734947, at *4–5. Federal Rule of Civil Procedure 7(b) makes clear that such an application must be in the form of a "motion which . . . shall state with particularity the grounds therefor, and shall set forth the relief or order sought." *O.R. Secs.*, 857 F.2d at 745.[3] And the FAA (again, the statute that HCSC expressly invokes in Count XI) says the same: "Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided." 9 U.S.C. § 6. And such an application must be made within three months of the award. 9 U.S.C. § 12; *see also Corey v. N.Y. Stock Exch.*, 691 F.2d 1205, 1213 (6th Cir. 1982) ("The three month notice . . . is meaningless if a party to the arbitration proceedings may bring an independent direct action asserting such claims outside of the statutory time period . . . ."). Finally, where the movant seeks to vacate for fraud (as HCSC does here), it must be supported by clear and convincing evidence. *Morgan Keegan & Co.*, 495 F. App'x at 447.

---

[3] The 2007 Amendments to Rule 7 changed the word "application" to "request," but made clear that this change was "stylistic only" and did not change the meaning. *See* Fed. R. Civ. P. 7(b) advisory committee's note to 2007 amendment.

The rules of notice pleading do not apply. A party cannot rely on mere allegations; otherwise, "the burden . . . would be on the party defending the arbitration award," and, absent a successful motion to dismiss, the proceeding "would develop into full scale litigation." *O.R. Secs.*, 857 F.2d at 745; *see also Legion Ins. Co. v. Ins. Gen. Agency, Inc.*, 822 F.2d 541, 543 (5th Cir. 1987) ("To permit time-consuming, costly discovery simply to replicate the substance of the arbitration would thwart its goal. The statutory bases for overturning an arbitral tribunal are precisely and narrowly drawn to prohibit such complete de novo review of the substance of the award . . . ."); *U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd.*, 188 F. Supp. 2d 358, 363 (S.D.N.Y. 2002), *aff'd*, 51 F. App'x 66 (2d Cir. 2002) ("[T]he FAA and Federal Rules of Civil Procedure do not contemplate full-blown litigation for the purposes of contesting an arbitration award with which a party may disagree."). If parties could take "full-bore legal and evidentiary appeals," arbitration would become "merely a prelude to a more cumbersome and time-consuming judicial review process." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

HCSC's amended complaint falls short of the requirements for vacatur. It lacks exhibits, declarations, or evidence of any kind. At most, it *alleges* that the Defendants initiated myriad IDR disputes and prevailed in many of them. *E.g.*, AC ¶¶ 10, 219. Of these, HCSC identifies only *three* by docket number and raises various substantive issues it already argued (and lost) in these IDR proceedings. AC ¶¶ 180–219. Nor does it plead the date of the award as to any of the arbitrations discussed in the amended complaint, *see* AC ¶¶ 188, 202, 216, and thus has failed to show that any of its requests are timely (*i.e.*, filed within the three months of the ruling). *See* 9 U.S.C. § 12. Nor has HCSC even said that it (rather than an unnamed affiliate) was a party to the arbitrations in question. 9 U.S.C. § 10 (allowing "any party to the arbitration" to move to vacate an arbitration award). HCSC carefully avoids pleading that it is a party, because it is not—only its affiliates, who

15

are not parties to this case, were. This too is fatal. Nothing in the FAA allows a parent company to aggregate and then seek vacatur for myriad arbitrations that its subsidiaries lost. At bottom, what HCSC filed is not nearly sufficient for vacatur.

    2.        **HCSC fails the substantive standard for vacatur.**

HCSC's vacatur claim also fails the demanding standard for vacatur. In the Fifth Circuit, "judicial review of an arbitration award is extraordinarily narrow." *U.S. Trinity Energy Servs., L.L.C. v. Se. Directional Drilling, L.L.C.*, 135 F.4th 303, 307 (5th Cir. 2025) (quotation omitted). A federal court's review of an arbitration decision is "exceedingly deferential." *Id*. (quotation omitted). "Doubts or uncertainties must be resolved in favor of upholding an arbitration award." *Id*. (cleaned up). And courts "are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract . . . ." *Morgan Keegan & Co.*, 495 F. App'x at 449 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)); accord *Guardian Flight II*, 140 F.4th at 621 n.4 ("[J]udicial review of an arbitration award under the FAA is extraordinarily narrow . . . [and] focuses on misconduct rather than mistake." (quotations omitted)).

Every court to address the NSA's incorporation of the FAA has applied the established meaning of paragraphs (1) through (4) of the FAA (§ 10(a)(1)–(4)) when evaluating challenges to NSA IDR determinations. *See Guardian Flight II*, 140 F.4th at 620; *Reach Air Med. Servs. LLC v. Kaiser Found. Health Plan Inc.*, 160 F.4th 1110, 1119 (11th Cir. 2025); *Anthem,* 2026 WL 982629, at *7; *Aetna*, 2026 WL 1556164, at *3. A plaintiff seeking to vacate an IDR award must therefore satisfy one of the four exceptions enumerated in paragraphs (1) through (4) of the FAA. HCSC seeks vacatur of thousands of arbitration awards on the grounds that they were "procured by corruption, fraud, or undue means" (§ 10(a)(1)) and that the IDREs "exceed[ed] their powers" (§ 10(a)(4)). AC ¶¶ 335–349. But as described below, the AC does not satisfy either test.

16

### a.   No grounds for vacatur under 9 U.S.C. § 10(a)(1)

*No fraud.* A party moving for vacatur under 9 U.S.C. § 10(a)(1) for fraud must demonstrate: "(1) that the fraud occurred by clear and convincing evidence; (2) **that the fraud was not discoverable by due diligence before or during the arbitration hearing**; and (3) the fraud materially related to an issue in the arbitration." *Morgan Keegan & Co.*, 495 F. App'x at 447 (quotation omitted and emphasis added).

First, HCSC fails to establish fraud by clear and convincing evidence. It merely alleges that Defendants misrepresented that claims were eligible for IDR arbitration under the NSA, that HCSC contested this eligibility at (at least some of) the arbitrations, and the arbitrator ruled in Defendants' favor in "many thousands" of disputes. *See, e.g.*, AC ¶¶ 172, 173, 187, 201, 215. But the Fifth Circuit has—like all other Courts considering this same issue—made clear that this is not fraud under the FAA. *Guardian Flight II*, 140 F.4th at 621–22; *Anthem*, 2026 WL 982629, at *7– 9; *Reach Air Med. Servs. LLC*, 160 F.4th at 1121–23.

HCSC also alleges that the Defendants committed fraud by seeking arbitration for claims that supposedly violate HCSC's "policies" (based on the Practice-Acquisition and Credentialing Theories). This theory goes nowhere. **The NSA does not permit an insurance company to unilaterally enact a "policy" about which claims can go to IDR, and then sue for fraud if a provider seeks arbitration for a claim that supposedly does not meet the insurance company's restrictive policy**. Furthermore, fraud requires a fraudulent statement, but no such fraudulent statement is alleged here (let alone with specificity). There are statutory and regulatory factors that define what is a "qualified" service and are relied on by IDREs to determine eligibility. *See* 42 U.S.C. § 300gg-111(c)(5)(C), (D); 45 C.F.R. § 149.510(a)(2)(xi), (a)(4)(iii). But compliance with a payor's "policies" is not one of those factors. Thus, the Defendants' alleged silence on this issue is not a misrepresentation. Nor does HCSC's Practice-Acquisition Theory or

17

Credentialing Theory have any connection to the enumerated and exhaustive list of factors that IDREs consider. *See* 42 U.S.C. § 300gg-111(c)(5)(C) (authorizing the IDREs to consider the QPAs, information requested by or provided to the IDRE relating to the offers made, the provider's background and market share, the patient's acuity, the scope of services offered by the provider, and demonstrations of good faith efforts between the provider and insurer to enter into network agreements).

Second, even if the alleged misrepresentations were somehow clear and convincing evidence of fraud (they are not), HCSC fails to meet the second requirement for vacatur under § 10(a)(1): that the fraud must not have been "discoverable by due diligence before or during the arbitration hearing." *Morgan Keegan & Co.*, 495 F. App'x at 447 (quotation omitted); *accord Barahona*, 376 F. App'x at 397 (noting a party fails "its burden of proof where the grounds for fraud . . . is not only discoverable, but discovered and brought to the attention of the arbitrators; in such a case, courts will not give a disappointed party . . . a second bite at the apple." (cleaned up)).

**Here, HCSC pleads that it was aware of the supposed misstatements and argued to the arbitrator that the statements were wrong.** HCSC has "pleaded itself out of court." *Anthem,* 2026 WL 982629 at *8 ("[B]y alleging that Plaintiffs knew about the false eligibility attestations and objected, Anthem has pleaded itself out of court . . . because the fraud was known during the IDR and disclosed to the IDRE." (cleaned up)); *Aetna*, 2026 WL 1556164, at *3 ("[Plaintiff's] own admission that it knew [defendants] were engaged in" the alleged fraud prior to the IDR arbitration "is fatal to [plaintiff's] position."). In HCSC's initial complaint, HCSC pleaded that it was aware of Defendants' alleged misrepresentations and objected to them. *E.g.*, Compl. (Dkt. 1) ¶¶ 162, 176, 190, 216. Recognizing that it "pleaded itself out of court," *Anthem*, 2026 WL 982629, at *8, HCSC attempts to save its vacatur claim by amending it to say that "[i]n many instances,

18

HCSC [did] not discover Defendants' deception until after the fact" and therefore was "unable to object," AC ¶ 178. But this does not remedy the fatal flaw in its allegations that in *each example that HCSC references in its amended complaint*, it alleges that it objected to the dispute's eligibility, *including raising these objections to the IDRE*:

- **DISP-461040**: "HCSC also submitted an objection to the IDR Dispute: DISP-461040 Objection: State specified law applies to this item or service. As a result, the [NSA] IDR Process is not applicable for the following claims." AC ¶ 187.

- **DISP-1965465**: "HCSC submitted an objection to the IDRE explaining that the services being disputed were ineligible for the IDR process: . . . This dispute includes items or services under a coverage type not subject to the [NSA] . . . . Objection to the following items or service which are under a coverage type not subject to the [NSA] Charge exceeds Medicare's reasonable amount. Therefore, this submission is not eligible for the Federal IDR Process." AC ¶ 201.

- **DISP-1299633**: "HCSC submitted an objection to the IDRE explaining that the services being disputed were ineligible for the IDR Process: Objection to the following items and services. State specified law applies to this item or service. As a result, the [NSA] IDR Process is not applicable for the following claims." AC ¶ 215.

The court in *Anthem* refused to find fraud for vacatur on these same facts. *See* 2026 WL 982629, at *8 (holding that plaintiffs failed to allege fraud for FAA vacatur where "[p]laintiffs objected to eligibility for all the sample determinations identified in the [amended complaint]"). By alleging that it contested eligibility to the arbitrator during the IDR process, HCSC defeats its own argument that any "misrepresentation" was undiscoverable by due diligence before or during the arbitration. Controlling precedent squarely forecloses further review. *See Barahona*, 376 F. App'x at 397; *see also Anthem*, 2026 WL 982629, at *8.

***No undue means.*** Under 9 U.S.C. § 10(a), "undue means" refers to "behavior that is immoral if not illegal." *Guardian Flight II*, 140 F.4th at 621 (quotation omitted). It warrants vacatur where behavior "is equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator." *Id.* at 622 (quoting *Am. Postal Workers Union, AFL–CIO v. U.S. Postal Serv.*, 52 F.3d 359, 362 (D.C. Cir. 1995)). "Circuits have uniformly construed the term undue means as

19

requiring proof of intentional misconduct." *Id.* (quotation omitted).

No evidence (or even allegation) of intentional conduct "equivalent in gravity to corruption or fraud, such as a physical threat to an arbitrator" is present here, or anything remotely close to it. At most, HCSC alleges Defendants submitted IDR claims that HCSC thinks were ineligible and made settlement demands that were larger than HCSC thinks were appropriate. AC ¶¶ 343, 172, 189, 203, 217. But as it alleges, HCSC objects to eligibility when it thinks a claim is ineligible for the IDR process, AC ¶¶ 187, 201, 215, and the IDRE is authorized, indeed required, to determine whether a claim is eligible for the IDR process. AC ¶¶ 142.f, 142.g, 142.h.

The same is true of HCSC's argument that Defendants' monetary demands were too high. As HCSC explains, the arbitrator's job is to select the most appropriate option between the two that are submitted (one by each side). AC ¶ 142.i. This decision is not subject to judicial review. Certainly, HCSC points to no statutory or other constraints limiting the amount that a provider can request in the IDR process. It objects that Defendants' demands were sometimes higher than reasonable market value for the services, but the NSA forbids IDREs from considering "usual and customary charges." 42 U.S.C. § 300gg-111(c)(5)(D). In any event, if the provider's offer is unreasonably high, then the arbitrator will select the insurance company's number instead.[4]

### b.       No grounds for vacatur under 9 U.S.C. § 10(a)(4)

Vacatur is permitted under § 10(a)(4) "where the arbitrators exceeded their powers, or so

---

[4] To the extent HCSC alleges undue means because IDREs are "incentivized not to scrutinize whether claims submitted to the IDR Process are eligible and to instead simply rubberstamp the provider's attestations of eligibility," AC ¶ 166, such argument fails where "this fee structure is part of the IDR rules established by Congress." *Anthem,* 2026 WL 982629, at *8. In *Anthem*, the court squarely rejected this argument, finding that "[s]uch financial incentives are not akin to bad faith or bribery." *Id*. Especially where, as here, the Complaint "does not allege that improper financial incentives motivated an IDRE's decision-making for any particular award." *Id*. In the end, this is rhetoric, not legal argument. That HCSC would prefer that Congress had written the law differently is not for this Court to resolve.

imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). In other words, vacatur is proper under § 10(a)(4) "[o]nly when the arbitrator acts outside the scope of their [] delegated authority." *U.S. Trinity*, 135 F.4th at 308 (cleaned up) (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)). And "merely 'convincing a court of an arbitrator's error—even his grave error—is not enough.'" *Id.* (quoting *Oxford Health Plans LLC*, 569 U.S. at 572). For this reason, when "determining whether the arbitrator exceeded his jurisdiction, [courts] resolve all doubts in favor of arbitration." *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 (5th Cir. 1993) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*, 460 U.S. 1, 24–25 (1983)).

HCSC merely alleges that the Defendants "induced the IDREs to 'exceed their powers' and render awards on services" not subject to the NSA. AC ¶ 347. Setting aside that this conclusory allegation does not satisfy pleading standards, HCSC's position is untenable. Congress and the implementing federal agencies expressly delegated authority to IDREs to decide both eligibility and between the parties' proposed awards for compensating the medical provider. *See* AC ¶¶ 142.f, 142.g, 142.h, 142.i; 42 U.S.C. § 300gg-111(c)(5); 45 C.F.R. § 149.510(c)(1)(v). And while reviewing an arbitration award under the FAA, courts are empowered to decide *only* whether the arbitrator has engaged in an authorized determination, not to second guess the accuracy of the decision. *See BNSF R.R. Co. v. Alstom Transp., Inc.*, 777 F.3d 785, 787 (5th Cir. 2015) (quoting *Oxford Health Plans LLC*, 569 U.S. at 569) ("[T]he sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."); *Anthem,* 2026 WL 982629, at *9 ("Our sole question under § 10(a)(4) is whether the arbitrator (even arguably) performed the assigned task, not whether she got the outcome right or wrong." (quotation omitted)). But that is precisely what HCSC asks the Court to do here.

21

Put simply, because the NSA is clear that IDREs have the power to decide the arbitrability of the dispute, 45 C.F.R. § 149.510(c)(1)(v), and to resolve the dispute by choosing one of two offers, 42 U.S.C. § 300gg-111(c)(5)(A)(i), HCSC fails to allege facts showing the arbitrators exceeded their powers. *See Anthem,* 2026 WL 982629, at *9. To say otherwise would be to make this Court a court of appeals for *de novo* review of each IDR eligibility ruling and subsequent dispute resolution. That is not the system that Congress designed. *Id.* (finding such a position "would be inconsistent with the NSA's creation of a streamlined IDR process for resolving surprise billing disputes and its limitations on judicial review").

## C.    The Court lacks subject-matter jurisdiction as to HCSC's other theories too.

Under Fifth Circuit precedent, the Court also lacks subject-matter jurisdiction as to HCSC's Practice-Acquisition and Credentialing Theories, as HCSC lacks Article III standing. *See Earl*, 53 F.4th at 900–04. Standing is an "irreducible constitutional minimum" to bring a case in federal court, and HCSC has the burden to establish it. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). It must plead facts showing: (1) an injury in fact; (2) that is fairly traceable to the challenged conduct of the Defendants; and (3) likely to be redressed by a favorable judicial decision. *Id.*; *Lujan*, 504 U.S. at 560–61.

HCSC has not done so. *First*, HCSC fails to show an injury in fact. The Fifth Circuit has rejected fraud-based theories of injury where the plaintiff received the product or service purchased and failed to plausibly allege that it was economically worse off under a counterfactual without the alleged fraud. In *Earl*, passengers alleged that Boeing and Southwest Airlines fraudulently concealed safety defects in a Boeing plane and as a result they either bought tickets they otherwise would not have purchased or paid more than they otherwise would have. 53 F.4th at 900–03. The Fifth Circuit rejected both theories, finding a lack of subject-matter jurisdiction. It held that *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315 (5th Cir. 2002), foreclosed standing because the plaintiffs

22

had purchased airline tickets and received flights without injury—just as the *Rivera* plaintiffs "paid for an effective pain killer, and they received just that." *Earl*, 53 F.4th at 902 (quoting *Rivera*, 283 F.3d at 320–21).

The same defect exists here. HCSC does not allege that the IOM services were not performed, were medically unnecessary, or were charged at a different rate as a result of the Practice-Acquisition or Credentialing Theory. To be sure, HCSC argues that it would choose not to pay for the care its insureds received if it knew about these supposed facts that the Defendants did not disclose, but that is the same as what the plaintiffs said in *Earl*—and under Fifth Circuit precedent, this is not enough. Like the plaintiffs in *Rivera* and *Earl*, HCSC received the benefit of what it paid for—IOM services—and does not plausibly allege that it is financially worse off because of the alleged misconduct. See *Earl*, 53 F.4th at 902–03.

Indeed, HCSC's case for standing is even weaker than the plaintiffs in *Earl* as both of its theories turn on what are at most, patient-protection rules—not statutes created to protect the insurer-plaintiff that brought the case. HCSC cannot establish standing by pointing to an alleged violation of policies intended to protect patients. The patients were not injured either, but even if they were, Article III requires HCSC to plead its own concrete injury, not a legal violation or a hypothetical risk to others. See *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021). And that these statutes were not written to protect insurers makes its case for standing weaker still. *See id.*

HCSC also fails the traceability test. Subject-matter jurisdiction demands a causal connection between the alleged injury and the challenged conduct; the injury must be fairly traceable to the defendant's conduct and not the result of independent actions by third parties. *Lujan*, 504 U.S. at 560–61. The Fifth Circuit recently reiterated that where the causal link depends

23

on independent decisions by third parties, standing is "substantially more difficult to establish," and that standing cannot rest on injuries caused by the "unfettered choices made by independent actors not before the court." *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (quotation omitted). HCSC's supposed injury (if there were one) is not fairly traceable to the conduct it challenges. The causal chain is too attenuated: NMA allegedly purchased certain practices; surgeons then selected NMA to perform IOM services; patients underwent procedures; IOM services were performed; HCSC received claims for reimbursement. HCSC has not pleaded facts showing that the supposed misconduct is traceable to any supposed injury. *See Reule*, 114 F.4th at 367–69. *Earl* rejects precisely that type of speculative counterfactual injury theory. 53 F.4th at 903.

Finally, HCSC fails to plead facts showing redressability. Assuming the facts it pleads are true, suppose that—under the injunction it seeks—it is only billed for claims for cases by physicians who did not sell their practices to NMA and all IOM readers are credentialed at all hospitals. HCSC would be in exactly the same position it is today: it would pay the same amount for the same care for its insureds. The same is true under its damages theory, as it has no injury for which to seek damages in the first place.

Because HCSC has not plausibly alleged a concrete injury that is traceable to the conduct at issue and redressable by the relief it seeks, the Practice-Acquisition and Credentialing Theories must be dismissed for lack of subject-matter jurisdiction.

## D.    HCSC's fraud claims fail.

For the reasons above, HCSC's fraud theory related to IDR arbitrations is barred by federal law. Even if it were not, it would fail because (for the reasons above) HCSC has not pleaded facts to show reliance, a required element of its fraud and negligent misrepresentation claims. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018).

24

That leaves HCSC's Practice-Acquisition and Credentialing Theories. Each fails for two reasons: because they do not include the details or specifics required under Rule 9(b), and because those facts that are pleaded simply do not show fraud.

In Texas, a plaintiff alleging fraud must show: "(1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result." *Id.* (cleaned up). "The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable." *Id.* (citation omitted).[5]

Rule 9(b)'s heightened pleading standard applies to HCSC's RICO, fraud, and negligent misrepresentation claims. *Arruda v. Curves Int'l, Inc.*, 861 F. App'x 831, 833–34 (5th Cir. 2021) (Rule 9(b) applies to RICO); *Sec. Data Supply, LLC v. Nortek Sec. & Control LLC*, 2019 WL 3305628, at *7 (N.D. Tex. July 22, 2019) ("In general, courts . . . require a plaintiff to plead the offense of commercial bribery with specificity under Rule 9(b)." (citation omitted)); *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 889 (5th Cir. 2024) ("Rule 9(b)'s heightened pleading requirements

---

[5] Similarly, to allege negligent misrepresentation, a plaintiff must show: "(1) a representation made by a defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *Id.* at 653–54 (cleaned up). HCSC's negligent misrepresentation claims do not have a "separate focus" from its fraud claims. Instead, it relies on the same alleged misrepresentations, subjecting its negligent misrepresentation claims to Rule 9(b). *See Momentum Glob. FZ LLC v. Kairos Glob. Trade, LLC*, 2026 WL 807337, at *6–7 (S.D. Tex. Mar. 24, 2026) (applying Rule 9(b) and dismissing negligent misrepresentation claim where the court found that there was "no 'separate focus'" for the negligent misrepresentation claim where the plaintiff relied on the same set of alleged misrepresentations as its fraud count).

apply when a plaintiff's misrepresentation claim sounds in fraud." (cleaned up)); *Cypress Home Care, Inc. v. Qlarant Integrity Sols., LLC*, 2020 WL 10317439, at *3 (E.D. Tex. Mar. 18, 2020) (Schroeder, J.) ("The Fifth Circuit recognizes that Rule 9(b) can apply to a claim for negligent misrepresentation when the fraud and negligent misrepresentation claims are sufficiently intertwined." (citation omitted)).

As the Fifth Circuit has emphasized, Rule 9(b) serves an important "screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Courts therefore apply this rule "with 'bite' and 'without apology,'" *id.* (citation omitted), requiring a complaint plausibly allege the "'who, what, when, where, and how' of the alleged fraud," *Thompson*, 125 F.3d at 903 (citation omitted). A plaintiff cannot rely on discovery to supplant the missing details. *See Webb v. Everhome Mortg.*, 704 F. App'x 327, 330 (5th Cir. 2017) (holding that "allowing [plaintiff's] insufficient fraud claim to proceed to discovery would defeat the purpose of Rule 9(b)'s heightened pleading standard"); *Preston L. Firm, L.L.P. v. Mariner Health Care Mgmt. Co.*, 2009 WL 10680007, at *3 (E.D. La. June 10, 2009) ("[T]he plaintiff cannot engage in discovery to fulfill the basic pleading requirements of Rule 9(b)."), *aff'd in part sub nom. Preston L. Firm, L.L.C. v. Mariner Health Care Mgmt. Co.*, 622 F.3d 384 (5th Cir. 2010).

### a.    The Practice-Acquisition Theory fails.

#### (i)    *No pleaded facts showing that any Defendant lied to HCSC.*

**The core failure of this theory is that it simply does not plead what the fraudulent statement—the lie—was.** In other words, HCSC fails the requirements to plead facts with specificity showing that the defendant made a material misrepresentation and knew its representation was false. *See JPMorgan Chase Bank N.A.,* 546 S.W.3d at 653. The most HCSC says is that it has a policy of not paying claims that do not comport with the Texas statutes that it

26

cites, and that the "submission of a claim for reimbursement to HCSC also **constitutes** a certification and representation of compliance with the Kickback Laws and Policies." AC ¶ 224 (emphasis added). It notes that the Defendants' claims for reimbursement are submitted to HCSC using standard government-issued forms. AC ¶¶ 29–32. While HCSC has not attached the form in question, it describes, relies on, and integrates it into its amended complaint, *see, e.g.*, AC ¶ 32, and thus the Court may properly consider it here. *Allen v. Hays*, 812 F. App'x 185, 189 (5th Cir. 2020); *see also United States v. Tarango*, 396 F.3d 666, 668–69 n.1 (5th Cir. 2005) ("HCFA 1500 claim forms are the standardized forms used when physician claims are submitted to insurance companies."); *United States v. Rashan*, 2026 WL 962444, at *2 (S.D.N.Y. Apr. 9, 2026) ("Healthcare providers are responsible for submitting claims for reimbursement to payers after furnishing a medical procedure or service. Providers submit their claims via the CMS 1500 claim form, which is the standard uniform professional provider healthcare billing form." (internal citations omitted)). The form in question is attached as Exhibit 4.

**What is missing are any specifics describing how the Defendants lied to HCSC**. In Texas, a plaintiff alleging fraud must show that "the defendant 'made a material representation that was false'" and did so knowingly or recklessly. *JPMorgan Chase Bank, N.A.*, 546 S.W.3d at 653 (citation omitted). HCSC has not done so. **First**, while it vaguely references its "policy" of not paying certain claims, it does not allege facts showing that it ever told any Defendant of this policy, that any Defendant knew about it, that any Defendant agreed to it, or that any Defendant falsely told HCSC that it had complied with it. Not only are there no *specifics* here (i.e., who, what, when, where, and how), there are no facts at all. **Second**, while HCSC says vaguely that submitting a claim "constitutes" a certification of compliance with these policies, it does not plead any *specifics* about any false statement. In other words, it does not say who lied to HCSC, what they said, when

27

they said it, where they said it, or how it is false. HCSC does not and cannot plead that the claim form contains a certification of compliance with these Texas laws or with HCSC's supposed policy. Even if the Court does not take judicial notice of the form, the claim fails for this reason— it is HCSC's job, as the plaintiff, to plead facts to make its case. But the Court can and should look at the form, Exhibit 4, and it will see that there is no certification of compliance with HCSC's policies or the laws in question.[6]

There is no other contract that was breached or that could serve as the basis for a fraud claim. These claims were all out-of-network—there is no contract between the Defendants and HCSC which could form the basis of an obligation to certify such compliance. *Cf. N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 469 (5th Cir. 2018) ("Out-of-network providers . . . have no contract with [the insurer] . . . ."). HCSC makes no allegation to support such a requirement.

And HCSC again failed to give the "when" or "where" of any supposed misrepresentation, instead providing only the date IOM services were provided. AC ¶¶ 80, 93, 106, 119. It variously lumps all the Defendants together, *see* AC ¶¶ 67, 77–78, 90–91, 103–04, 117–118, or claims NMA was the sole culprit, *see* AC ¶¶ 54, 75, 88, 101, 114. And with respect to the supposedly tainted claims, HCSC again fails to allege "who" submitted them for all but 12 of the 475 claims HCSC states were "tainted." AC ¶¶ 80, 93, 106, 119. Nor does it plead facts to explain why it did not know about the Defendants' business arrangements at the time it paid the claim, but does know about them now.

---

[6] The only representations on the form even close to what HCSC describes are expressly limited to claims *to the government* "for payment from federal funds" under Medicare; there is no reference to HCSC's policies or Texas law at all. *See* Exhibit 4 at 2.

### (ii)    *No facts to show a violation of the Texas laws that underpin HCSC's theory.*

HCSC's theory is that the Defendants lied about complying with the Texas laws. The section above shows that the Defendants did not certify compliance with these laws. Moreover, the facts pleaded in the Complaint do not show a violation of those laws in the first place. HCSC has failed to plead facts that rule out obvious alternative and lawful explanations for the transactions at issue. HCSC continues to advance its utterly unsupported conclusion that the former surgeon-owned entities NMA (or a related entity) purchased "were and are essentially worthless," AC ¶ 51, and so NMA *must* have paid a price "that far exceeded[] fair market value" for the entities, AC ¶ 52. It does not plead any facts about what the price was, and why it was unreasonable. And the facts HCSC pleaded are consistent with a straightforward alternative: NMA paid valuable consideration for ownership of these entities (including accounts receivable, intangible value, and existing business relationships reflected in HCSC's own allegations). HCSC has not pleaded facts to rule out these alternative lawful explanations, and its claim thus fails under Rules 8(a) and 9(b). *See Twombly*, 550 U.S. at 567.

HCSC likewise alleges that the surgeons set up the subject entities to help them order and provide IOM services for their patients. AC ¶¶ 71, 84, 97, 110. After NMA or a related entity bought the entities, the doctors did not switch to different, unrelated companies for IOM. HCSC claims the *only* explanation for that behavior is that NMA paid them a kickback. AC ¶ 54. But again, the conclusory nature of HCSC's allegation illustrates how it failed to rule out the same obvious alternative explanation: the doctors did not want to change to an entirely new provider. There are plenty of reasons a surgeon would do so, including to ensure the same quality of service or avoid costs associated with switching. In other words, HCSC's theory fails because it relies on an assumption that the only reason the surgeons would not change IOM providers is that they

29

received kickbacks. The flaw in this logic speaks for itself.

There is likewise an obvious alternative lawful explanation for HCSC's new claim that the only supposed kickback paid was the purchase price for the former surgeon-owned entities, "paid in installments." AC ¶ 53. Businesses and individuals alike regularly choose to pay a debt or purchase price, or to receive payment, in installments, and for a variety of reasons. One particularly salient reason here is liquidity: NMA, amid a strategic business expansion, *see* AC ¶ 48, needed to keep its liquid capital base as free as it could so that it could continue to make advantageous acquisitions. HCSC thus failed to rule out several "obvious alternative explanation[s] for the decision[s]" that it claims were illicit. *See Pickett*, 37 F.4th at 1034 (cleaned up). That failure is fatal to its claim.

HCSC's attempt to impute guilt through allegations in *other* lawsuits from years prior likewise fail. *See* AC ¶¶ 61–63 (citing complaint filed against NMA in federal court in Illinois in 2018 by a competing IOM provider). To start, a competitor's unverified claims in a complaint are not facts pleaded in this case and therefore do not move the needle on plausibility. *See Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 123–24 (5th Cir. 1996); *cf. Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998). HCSC has not pleaded—it has not certified under Rule 11(a)—that these things are true to its knowledge, merely that another plaintiff alleged them. This is especially problematic where the case was dismissed by stipulation of the parties, without the court ruling on several motions to dismiss. *See* Minute Entry, Dkt. No. 56, *Nuvasive Clinical Servs., Inc. v. Neuromonitoring Assocs., LLC*, No. 1:18-cv-4304 (N.D. Ill. Mar. 15, 2019).

HCSC also misunderstands the statutes it cites. HCSC cites the Texas commercial bribery statute, Tex. Penal Code § 32.43, which makes it an offense for a fiduciary to solicit or accept a

30

benefit—without the beneficiary's consent—on an understanding that the benefit will influence the fiduciary's conduct in the beneficiary's affairs. *Id.* § 32.43(b). This statute has five elements HCSC must prove: "1) intentionally or knowingly; 2) offering, conferring, or agreeing to confer a benefit; 3) to a fiduciary; 4) without the consent of the fiduciary's beneficiary; and 5) acceptance of that benefit would be a violation of Subsection (b)." *In re: DuPuy Orthopaedics, Inc.*, 2016 WL 6271465, at *6 (N.D. Tex. Jan. 5, 2016) (citing Tex. Penal Code § 32.43(c)). Here, even if the allegations were true (they are not), HCSC cannot show a violation of § 32.43.

*First*, HCSC cannot establish the essential knowledge element. As a matter of law, the purported offeror of the illegal bribe (in this case the Defendants) must know that the doctor would violate a fiduciary duty owed to his patient to prove a violation of § 32.43. 6 Tex. Prac. Texas Criminal Law § 19.9 (2d ed. Apr. 2025 update) ("An essential element is that the offeror must know that the offeree is a fiduciary and that the offeree would violate a duty owed to a beneficiary by accepting the offer."). But here, the IOM services provided were necessary—there is no evidence that the patients, in fact, did not need such monitoring. So what fiduciary duty was violated? HCSC does not say. And without an underlying fiduciary violation, HCSC cannot show that NMA "knowingly" engaged in commercial bribery because it could not have known its "conduct [was] reasonably certain" to cause the doctors to violate a fiduciary duty owed to their patients. Tex. Penal Code § 6.03(b) (defining culpable mental states).

Nor can HCSC show that the acceptance of the alleged bribes by the surgeons "influence[d] the conduct of the fiduciary in relation to the affairs of his beneficiary." *Id.* § 32.43(b). As noted above, the facts as pleaded by HCSC show the opposite. It alleges that the referring surgeons set up the subject entities from which they ordered IOM services. *See* AC ¶¶ 71, 73, 84, 86, 97, 99, 110, 112. And after the acquisition of these entities, the surgeons *continued to order IOM services*

31

*from entities* affiliated with NMA. *See* AC ¶¶ 78, 91, 104, 117. HCSC claims the only explanation for this conduct was bribery. *See* AC ¶¶ 79, 92, 105, 118. For the reasons given above, there are obvious alternative explanations for that alleged conduct. In any event, the amended complaint's allegations show the purchase of the entities did *not* "influence the conduct" of the doctors "in relation to the affairs of" their patients because they did not switch to an unrelated provider. *See* Tex. Penal Code § 32.43(b). Even if that were not true, the commentary to § 32.43 makes clear the statute "does not reach a simple breach of fiduciary duty; it covers only corrupt breaches that involve a bribe." *Jackson v. Radcliffe,* 795 F. Supp. 197, 206 (S.D. Tex. 1992). HCSC failed to adequately allege any illicit payment to the surgeons. It has therefore failed to adequately plead the elements of commercial bribery—let alone based on supposed claims to HCSC for payment in which any Defendant failed to disclose the same.

**Second**, HCSC references—again, only in passing—supposed violations of the Texas Patient Solicitation Act, Tex. Occ. Code § 102.001 *et seq*. AC ¶ 24. That statute prohibits knowingly "offer[ing] to pay or agree[ing] to accept . . . any remuneration . . . or any benefit or commission to or from another for securing or soliciting a patient or patronage for or from a person" licensed by a state healthcare regulatory agency. Tex. Occ. Code § 102.001(a). But here, HCSC fails to do anything but quote the statute, let alone allege any of the required elements.

Even if it had, however, this statute does not reach the alleged conduct. An adjacent section of the Act provides that this provision "permits any payment, business arrangement, or payment practice permitted by 42 U.S.C. Section 1320a-7b(b) or any regulation adopted under that law." *Id.* § 102.003. But 42 U.S.C. § 1320a-7b(b) only proscribes remuneration arrangements that implicate a *federal* healthcare program. *See id.* (prohibiting kickbacks, bribes, or rebates in return for providing or arranging to provide a service "for which payment may be made in whole or in

part under a Federal health care program"). Payment structures that do *not* implicate a federal healthcare program are permitted by the federal statute. Since such arrangements are permitted by the federal statute, they are permitted by § 102.001. Here, HCSC is not a federal health care program. Its claims under § 102.001 therefore fail as a matter of law since the federal statute does not reach such claims.

*Third*, HCSC again resorts to another provision of the Texas Patient Solicitation Act, Tex. Occ. Code § 101.203, AC ¶ 26, which prohibits healthcare professionals from violating Tex. Health & Safety Code § 311.0025. The latter section in turn prevents such professionals from submitting to a patient or third-party payor a bill for treatment which that professional "knows was not provided or knows was improper, unreasonable, or medically or clinically unnecessary." Tex. Health & Safety Code § 311.0025(a). HCSC's claims under this statute still fail as a matter of law.

Once again, HCSC fails to allege anything beyond quoting this statute's language. HCSC does not allege that the services billed for were not provided, were medically unnecessary, or were unreasonable—or that the Defendants made false representations about any of these things. At most, HCSC attempts to claim that the IOM services provided were "illicit" because they "are tainted by kickbacks." *See, e.g.*, AC ¶¶ 93–94. "Illicit" means "[i]llegal or improper." *Illicit*, Black's Law Dictionary (12th ed. 2024). But HCSC fails to show that these services were illegal (as it has not shown violations of the statutes on which it relies). Nor can it show these services were improper—its own amended complaint draws a clear distinction between the doctor-owned structure the HHS's OIG found could be illegal and the structure HCSC claims exists here. *Compare* AC ¶¶ 44–46, *with id.* ¶¶ 75, 88, 101, 114.

*Fourth*, to the extent the statutes are ambiguous as to their application to the conduct HCSC alleges, this Court should not interpret them more broadly than their intended purposes. Texas law

33

explicitly requires judges to interpret criminal statutes "according to the fair import of their terms, to promote justice and effect the objectives" of the criminal law. Tex. Penal Code § 1.05(a). Here, the fair import of each statute evinces a distinct, limited purpose: prohibiting direct bribes and other explicit *quid pro quo* arrangements that harm beneficiaries. But that purpose would not be served by broadening the reach of these statutes to prohibit arrangements which HCSC does not allege harm the beneficiaries: here, the patients.[7]

### b. The Credentialing Theory fails.

The amended complaint also asserts that the Defendants committed fraud because an unnamed source supposedly told HCSC that sometimes the Defendants use two physicians to read IOM results, and that in some instances one of the two readers is either not credentialed at the hospital in question or licensed in the state in question. AC ¶¶ 226, 254. The source told HCSC that two IOM readers are always assigned to a particular operation; one is "credentialed at the rendering facility and licensed in the state where the procedure is taking place," while one "*typically* is not." AC ¶ 124 (emphasis added). HCSC asserts this is "an additional reason" why the claims are not payable. AC ¶ 121. To be clear, HCSC does not allege that more than one physician needs to perform the IOM reading in the first place (i.e., it is not that two licensed and credentialed physicians are required).

---

[7] HCSC also asserts an impliedly alternative claim: that the same conduct alleged to constitute fraud also constitutes negligent misrepresentation. But that claim fails for the same reasons as given above—HCSC has failed to sufficiently plead a violation of the kickback laws that underlie both claims. Indeed, HCSC relies on the same allegations to support its claim for negligent misrepresentation. Thus, the fraud claim is "so intertwined with the negligent misrepresentation claim that it is not possible to describe a simple redaction that removes the fraud claim while leaving behind a viable negligent misrepresentation claim." *Am. Realty Trust, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 362 F. Supp. 2d 744, 749 (N.D. Tex. 2005). The necessity for this Court to "engage in line-by-line redaction in order to excise inadequate averments of fraud from accompanying claims of negligent misrepresentation" thus counsels in favor of dismissal. *See id.* at 752.

This theory fails under Rule 9(b) because the facts in the amended complaint do not show fraud—i.e., a lie. Perhaps most importantly, HCSC *never identifies* the law, rule, or policy requiring both readers to be licensed and credentialed. Whether a non-physician IOM reader must be *state-licensed* rather than certified under facility policy is generally state- and role-dependent; CMS's cited hospital telemedicine language does not, by itself, create a universal licensure rule for all states or roles. *See* Ex. 5, CMS, Memorandum, *Telemedicine Services in Hospitals and Critical Access Hospitals* (Jul. 15, 2011), https://www.cms.gov/medicare/provider-enrollment-and-certification/surveycertificationgeninfo/downloads/scletter11_32.pdf.

And HCSC does not list any claims where this supposedly happened. It does not list any doctors supposedly involved. It does not list any entities other than NMA, though in another part of the complaint it says NMA does not do such work itself, but "through its related and commonly owned entities," none of which is named with respect to credentialing. AC ¶ 60. HCSC names two hospitals but implies there are more. *See* AC ¶ 128. Indeed, HCSC does not even say the "primary" did not have access to the IOM data during procedures, which would be an obvious prerequisite for the "secondary" "perform[ing] the IOM reading." AC ¶ 125. HCSC also does not say why or how "the ordering surgeon has no way of knowing that this is occurring"—even though, for the service to be effective, they *must* be able to communicate somehow. *Id.*

And yet, despite providing *nothing* beyond general accusations and conjecture, HCSC posits that it is "highly likely" such activity occurred. AC ¶ 129. But it also cannot say whether this occurred with respect to any claim mentioned in the amended complaint. All it *can* say is that "some or all of these claims" *may* have been performed this way, asserting that is "highly likely." *Id.* But all HCSC offers is wild conjecture that NMA "acknowledge[s] and encourage[s]" this practice "companywide," AC ¶ 127, irrelevant speculation on why NMA is supposedly doing this,

35

AC ¶ 126, and rumors from an unnamed "former employee" who, quite conveniently, *only* alleges that this practice included two Texas hospitals—nothing else, AC ¶ 128. That's not highly likely. That's implausible, let alone plausible and specific enough to satisfy Rule 9(b).

**E.      HCSC's RICO claims fail.**

HCSC offers two RICO claims, one premised on its NSA Theory (Count X) and the other on its Practice-Acquisition Theory (Count IX).

**1.        The RICO claim based on the NSA Theory fails.**

The RICO claim based on the NSA Theory fails for reasons already established, and which are incorporated here by reference: the Court lacks subject-matter jurisdiction to apply RICO as a collateral attack on arbitration awards. *See HaloMD*, 2026 WL 1557492, at *3, *Anthem*, 2026 WL 982629, at *9–10, AC at 38 n. 24; *supra* § IV.A.

The theory also fails because it is based on the incorrect premise that submitting requests for arbitration and arbitration documents via wire amounts to wire fraud. As a matter of law, the "mailing of litigation documents, even perjurious ones, [does] not violate the mail-fraud statute." *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002); *see also Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524–25 (5th Cir. 2016) (citing *Pendergraft* and noting that "we agree with our sister circuit that 'prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system'").[8] Likewise, courts have repeatedly held that litigation activity generally cannot give rise to racketeering liability. *See Snow Ingredients*, 833 F.3d at 524–25; *Pendergraft*, 297 F.3d at 1208 (collecting cases); *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) (collecting cases). This rule applies to actions taken in furtherance of litigation more broadly. *See CADG Erwin Farms, LLC v. Ipour*, 2024 WL 1394501,

---

[8] This applies to electronic transmissions, as mail and wire fraud are treated interchangeably for RICO purposes. *United States v. Bruno*, 809 F.2d 1097, 1104 (5th Cir. 1987).

at *5–7 (N.D. Tex. Mar. 31, 2024) (holding that mailing notices of default or termination, and filing lawsuits and notices were insufficient predicate acts under RICO because "the Fifth Circuit has expressly held that, in the absence of other criminal acts, such litigation activity, even if in bad faith, cannot serve as the basis for a civil RICO claim"); *Snow Ingredients, Inc.*, 833 F.3d at 524–25. This is the case even where the plaintiff alleges the lawsuits were malicious. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1087–88 (11th Cir. 2004) (holding that an "alleged conspiracy to extort money through the filing of malicious lawsuits" are not predicate acts of extortion or mail fraud under RICO); *see also CADG Erwin Farms*, 2024 WL 1394501, at *7 ("The Complaint contains no allegations of any criminal activity in connection with the lawsuits and *lis pendens*, such as witness tampering or other corruption, which could trigger RICO's applicability.").

These principles extend to arbitration proceedings as well, as courts have held that arbitration activities cannot form the basis for mail or wire fraud. *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 60–61 (D.D.C. 2019) (holding that litigation materials transmitted during a prior arbitration could not constitute wire or mail fraud); *Diamond Resorts Int'l, Inc. v. Aaronson*, 2018 WL 735627, at *5 (M.D. Fla. Jan. 26, 2018) (holding that false statements in arbitration demands were not grounds for mail or wire fraud). HCSC's supposed predicate acts therefore fail under this rule because all the alleged misrepresentations it points to pertaining to the IDR theory are in submissions made attendant to the IDR process. *See* AC ¶¶ 3, 9, 172, 175, 184, 191, 196, 205, 210, 219, 332. Such arbitration conduct cannot support a wire fraud theory. *See Snow Ingredients, Inc.*, 833 F.3d at 524–25; *Pendergraft*, 297 F.3d at 1208. And while HCSC claims that allegedly ineligible filings forced it into arbitrations it otherwise would have avoided, such alleged conduct is insufficient even where it "led to Plaintiffs engaging in subsequent arbitrations that might not have otherwise occurred." *See Diamond Resorts Int'l*, 2018 WL 735627, at *5.

37

Likewise, procuring payments secured through successful IDR arbitrations is simply an extension of the same litigation-related conduct, and it cannot support a mail or wire fraud claim. *See Snow Ingredients*, 833 F.3d at 524–25 (5th Cir. 2016); *Pendergraft*, 297 F.3d at 1208. Nor does HCSC plead any misrepresentation regarding collection of judgments obtained through successful arbitrations. That dooms its claim, as proof of deceptive conduct is required for wire fraud. *See CADG Erwin Farms*, 2024 WL 1394501, at *5; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010) ("[A] plaintiff must allege that some kind of deceptive conduct occurred in order to plead a RICO violation predicated on mail fraud." (citation omitted)).

2.     **The RICO claim based on the Practice-Acquisition Theory fails.**

To state a civil RICO claim under 18 U.S.C. § 1962(c), HCSC must allege three common elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Snow Ingredients, Inc.*, 833 F.3d at 523–24 (internal quotation omitted). Additionally, a plaintiff lacks RICO standing if it fails to demonstrate an injury to its "business or property ***by reason of*** a violation of § 1962." *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 338–39 (5th Cir. 2021) (emphasis added).[9]

a.     **Failure to plead RICO injury**

A "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985). And a "defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." *Id*. (quoting approvingly from *Haroco, Inc. v. Am. Nat'l Bank & Tr.*

---

[9] These arguments also apply to the RICO claim based on the NSA Theory, although that theory first fails for jurisdictional reasons. To the extent the theory survives, these arguments are incorporated by reference as to the NSA Theory.

*Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984)). HCSC has not pleaded facts to show that it was injured in any way by the supposed violation of § 1962.

Specifically, HCSC has not pleaded facts to show that it paid for medical care that was unnecessary, or that cost more than it would have had the practice acquisitions not been structured in the form to which HCSC objects. In fact, HCSC does not dispute that it must pay for IOM services that its insureds receive and does not allege any instance where IOM services were not medically necessary. But a plaintiff lacks RICO standing if it fails to demonstrate an injury to its "business or property **by reason of** a violation of § 1962." *HCB Fin. Corp.*, 8 F.4th at 338–39 (emphasis added). *See generally* 18 U.S.C. § 1964(c). This requires a showing of "concrete financial loss." *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492 n.16 (5th Cir. 2003). A plaintiff fails to allege an injury when its allegations do not demonstrate it paid more than it would have absent the racketeering activity, as HCSC fails to do here. *See Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) (affirming the dismissal of RICO claim where plaintiffs did not allege "they received something different than precisely what they bargained for" or "that the value of the cards that they did receive is less than the consideration paid"); *Earl*, 53 F.4th at 903 (holding that plaintiffs did not allege an injury where they did not allege "that they're any worse off financially because [of] defendants' fraud," reasoning that "[i]n an ordinary fraud lawsuit—a pyramid scheme, for example—there are identifiable victims who lost money that wouldn't have been lost in a counterfactual world without the fraudulent scheme").

Indeed, HCSC fails to allege RICO standing for three main reasons. **First**, there are no allegations that it paid more for IOM services than it would have absent the alleged referral agreement. *See Earl*, 53 F.4th at 903 (rejecting an "overcharge-by-fraud" theory of injury). **Second**, HCSC does not allege that the IOM services were never performed; its insureds received

39

the service for which HCSC paid. *See Price*, 138 F.3d at 607. **Finally**, it does not allege that it paid for IOM services that were not necessary. Indeed, HCSC does not allege that its insureds did not need IOM, meaning that it would have paid for the IOM services regardless. Put simply, HCSC did not "los[e] money that wouldn't have been lost in a counterfactual world without the fraudulent scheme." *See Earl*, 53 F.4th at 903 (finding no RICO injury where passengers alleged they would not have bought tickets on an airplane that did not satisfy regulatory certifications); *see also Rivera*, 283 F.3d at 320–21 (no injury where plaintiffs paid for and received an effective painkiller, despite regulatory and safety risks). And awarding damages to HCSC without any consideration for the fact that these medical services were indisputably provided would reward HCSC with a windfall: it would effectively not have to pay for treatments its insureds needed and actually received, and for which it has an obligation to pay.

At most, HCSC objects to Defendants' corporate structure. *See, e.g.*, AC ¶ 321. But this dissatisfaction is not itself a concrete injury to business or property. After all, the Texas state statutes to which HCSC cites as prohibiting kickbacks—Tex. Occ. Code § 102.001, Tex. Penal Code § 32.43, and Tex. Occ. Code § 101.203—are meant to protect patients, not insurers. The Texas anti-bribery statute criminalizes corrupt benefits accepted by a "fiduciary" which influences his conduct in relation to a "beneficiary." In other words, its purpose is to protect beneficiaries from corrupt arrangements involving those who have a duty to put the beneficiary's best interests first. *See* Tex. Penal Code § 32.43. But here, it is undisputed that HCSC is not a beneficiary; the patients are the beneficiaries, and they received their necessary medical services.

Put simply, HCSC must plead that the alleged racketeering conduct directly caused it to pay money it otherwise would not have paid. Because the amended complaint does not do so, HCSC lacks civil RICO standing. *See* 18 U.S.C. § 1964(c); *HCB Fin. Corp.*, 8 F.4th at 338–39.

40

### b.  Failure to plead predicate acts

A RICO claim must include at least "two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *Snow Ingredients, Inc.*, 833 F.3d at 524 (citation omitted). Here, HCSC relies on two theories: wire fraud (the submission of claims to HCSC, and transmission of the associated payments, etc.) and violations of the Texas commercial bribery statute, Tex. Penal Code § 32.43. *See* AC ¶¶ 308–22, 332. Each fail.

### (i)  Wire fraud

HCSC argues that NMA's submission of claims for payment constitutes wire fraud because those claims were allegedly "tainted" by kickbacks. AC ¶ 309. As noted above, pleading a fraudulent scheme under RICO requires allegations of deceptive conduct. And to show deceptive conduct, a plaintiff must allege a fraudulent statement or other violation of the wire fraud statute. HCSC has not. *See supra* § IV.D.a. For the reasons in the sections above, which are incorporated by reference here, HCSC has not alleged with specificity a fraudulent statement that any Defendant made to HCSC. In short, it has not shown fraud—without fraud, there is no wire fraud.

### (ii)  Commercial bribery

HCSC also points to supposed violations of the Texas commercial bribery statute, Tex. Penal Code § 32.43, as predicate acts to support its RICO claim; this theory fares no better than the others. For the reasons given above, *see supra* § IV.D.a.ii, which are incorporated by reference here, the Texas commercial bribery statute has no private right of action and does not reach the conduct HCSC alleges. But even if it did, HCSC has not pleaded facts supporting each required element of the offense. *See id.* Where a RICO plaintiff "seeks to allege racketeering activity through the commission of state statutory offenses," that plaintiff must "allege facts plausibly showing the commission of those offenses—that is, *each* element of *each* identified state statutory offense." *In re EpiPen Direct Purchaser Litig.*, 2023 WL 2860858, *4 (D. Minn. Apr. 10, 2023).

Finally, as shown above, HCSC has not shown that it was injured "by reason of" the supposed violation. *See* 18 U.S.C. § 1964(c); *supra* § IV.D.2.a.

<strong>c.      Failure to plead the existence of a RICO enterprise</strong>

HCSC also fails to adequately plead the existence of a RICO enterprise. To avoid dismissal under Rule 12(b)(6), HCSC "must plead specific facts, not mere conclusory allegations, which establish the existence of an enterprise." *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989). An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

HCSC's RICO claims rely on an "associated-in-fact" enterprise theory. AC ¶ 292. *See generally* 18 U.S.C. § 1961(4). It alleges that the Defendants and "the surgeons who made referrals to NMA and Physician Oversight"—who HCSC calls the "Ordering Surgeons"—formed the associated-in-fact enterprise. AC ¶ 292. The Supreme Court has held that an association-in-fact enterprise must possess three qualities: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (citation omitted). In other words, it must be "a continuing unit that functions with a common purpose." *Id.* at 948. Ultimately, the court "must be wary of transforming business-contract or fraud disputes into federal RICO claims." *See Arruda*, 861 F. App'x at 836; *accord Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) (noting that courts distinguish between "run-of-the-mill commercial relationship[s] where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest" and highlighting that "[t]his distinction is important"); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855–56 (7th Cir. 2013) (concluding that the allegations were insufficient to plead an association-in-fact enterprise

42

where the allegations demonstrated only that "defendants had a commercial relationship, not that they had joined together to create a distinct entity" for engaging in fraud).

HCSC fails to allege a relationship among "those associated with the enterprise," e.g., among Defendants and the Ordering Surgeons. *Boyle*, 556 U.S. at 946. As to the IOM Referral Enterprise, HCSC alleges parallel, bilateral conduct between the Defendants and ordering surgeons (e.g., the surgeons ordered IOM services which the Defendants provided). What it fails to allege is any collaboration among the Ordering Surgeons and NMA entities beyond parallel conduct that, at most, is indicative only of reasonable commercial activity (ordering and provision of IOM services) conducted in parallel. But failure to "plausibly imply anything more than parallel conduct" cannot support that the Defendants and the ordering surgeons "associated together for a common purpose." *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010) (quoting *Boyle*, 556 U.S. at 946); *Brunig v. Clark*, 560 F.3d 292, 297 (5th Cir. 2009) (dismissing RICO claim where plaintiff alleged only "a conclusory statement, a recitation of the elements masquerading as facts [that] does not make it any more or less probable that the listed parties have an existence separate and apart from the pattern of racketeering"). Especially where HCSC fails to plead facts to "plausibly imply concerted action" it did not allege any "collaboration among the [ordering surgeons]" to further the purported scheme. *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d at 374.

**F.      The Court should dismiss HCSC's claims for money had and received.**

After dismissing the federal claims, the Court should not exercise its supplemental jurisdiction to hear these state-law equitable claims. However, even if the Court did reach it, it should still dismiss the claims for money had and received.

In Texas, money had and received is an equitable claim, where "a plaintiff must show that a defendant holds money which in equity and good conscience belongs to [the plaintiff]." *Baylor*

43

*Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 293 (Tex. Ct. App. 2021) (citation omitted). But a plaintiff cannot "survive the motion to dismiss stage by pleading only legal conclusions." *Partners & Friends Holding Corp. v. Cottonwood Minerals L.L.C.*, 653 F. Supp. 3d 344, 349 (N.D. Tex. 2023).

As to the Practice-Acquisition Theory, HCSC does not dispute that the IOM services were medically necessary or that they were actually provided, nor does it plead that it paid more than it would have from another provider. If it invokes equity to receive these services for its insureds for free, its request must fail. As to its Credentialing Theory, HCSC has not identified or pleaded with specificity facts about a single patient who did not receive care from at least one licensed and credentialed IOM reader; why, in these circumstances, would the result be that HCSC should not have had to pay for them? HCSC thus cannot show that Defendants hold money that "in equity and good conscience" belongs to it. *Baylor Scott & White*, 633 S.W.3d at 293. The Court should dismiss these claims, if it reaches them at all.

**G.      HCSC's declaratory judgment counts and requests for injunctive relief fail.**

The Declaratory Judgment Act is discretionary; courts "*may*" declare such rights but are not required to do so. 28 U.S.C. § 2201(a) (emphasis added); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007). When exercising its discretion to consider "a declaratory judgment action, a district court must engage in a three-step inquiry." *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). "The court must ask (1) whether an actual controversy exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 294 (5th Cir. 2019) (cleaned up).

HCSC's request for declaratory judgment fails as to its IDR claims because the Court lacks subject-matter jurisdiction to review these arbitration awards, for the reasons set out above. The

44

Court likewise lacks authority to grant declaratory judgment as to HCSC's claims based on its Practice-Acquisition Theory. The Declaratory Judgment Act "does not provide . . . jurisdiction." *California v. Texas*, 593 U.S. 659, 672 (2021). Rather, as with "every other type of remedy," the plaintiff must satisfy the basic standing and jurisdictional requirements of Article III. *Id.* Likewise, as to the Texas statutes HCSC cites for its Practice-Acquisition Theory, none provides a private right of action. *Spurlock v. Johnson*, 94 S.W.3d 655, 658 (Tex. Ct. App. 2002); *Conn. Gen. Life Ins. Co. v. Elite Ctr. for Minimally Invasive Surgery LLC*, 2017 WL 607130, at *15 (S.D. Tex. Feb. 15, 2017), *amended and superseded in part*, 2017 WL 1807681 (S.D. Tex. May 5, 2017). It is well established by courts within the Fifth Circuit that "declaratory judgment under 28 U.S.C. § 2201 is not available where the substantive statute at issue does not provide a private right of action." *See, e.g.*, *DAC Surgical Partners P.A. v. United Healthcare Servs., Inc.*, 2016 WL 7177881, at *13 (S.D. Tex. Dec. 8, 2016) (internal quotation omitted and collecting cases).

A similar outcome must follow as to HCSC's request for injunctive relief. Injunctions are an equitable remedy and are not awarded as "a matter of right." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted). HCSC's claim for equitable relief still suffers from a fatal flaw: the only harm HCSC claims to have suffered is a monetary one. *See* AC ¶¶ 10, 81, 94, 107, 120, 143, 175–176, 188–190, 202–204, 216–218, 227, 232, 242, 247, 257, 260, 267, 272, 275–278, 327, 344. Alleged injuries involving only the loss of money are not irreparable. *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money . . . are not enough.").

## V.    CONCLUSION

For the above reasons, the Court should dismiss the amended complaint with prejudice.

Respectfully submitted,

Dated: June 18, 2026

/s/ *Matthew L. Knowles*

John M. Pickett
Texas Bar No. 15980320
**LAW OFFICES OF JOHN M. PICKETT**
4122 Texas Blvd.
Texarkana, TX 75503
Telephone: (903) 794-1303
Fax: (903) 792-5098
jpickett@jpickettlaw.com

Matthew L. Knowles (*pro hac vice*) (Lead attorney)
Asseret Frausto (*pro hac vice*)
Carolyn Zaccaro (*pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 535-4000
Fax: (617) 535-3800
mknowles@mcdermottlaw.com
afrausto@mcdermottlaw.com
czaccaro@mcdermottlaw.com

R. Bray McDonnell (*pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
500 N Capitol Street NW
Washington, D.C. 20001
Telephone: (202) 756-8000
Fax: (202) 756-8087
rmcdonnell@mcdermottlaw.com

***Attorneys for Defendants***

46

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF filing system, which will generate and send an e-mail notification of said filing to all counsel of record on June 18, 2026.

/s/ Matthew L. Knowles
Matthew L. Knowles